DAVID W. LA FRAMBOISE v. R. NOBLE DAY AND OTHERS.[1]

March 2, 1917.

Nos. 20,080—(205).

**Descent and distribution — Indian divorce — evidence.**

In this action involving the title to real estate, the pivotal question was as to whether plaintiff was the son and heir of the Indian half-breed to whose heirs a patent for the land was issued. It is *held*:

(1) The complaint alleging the marriage of the half-breed and plaintiff's mother, and that plaintiff was the son and heir, evidence to show a divorce some years before the birth of plaintiff was admissible under a general denial.

(2) Where a half-breed marries an Indian woman according to Indian custom, lives with her as her husband in the tribal haunts, and is there divorced from her according to Indian custom, such divorce will be recognized by the courts of the state as terminating the marriage rela-

[1]Reported in 161 N. W. 529.

tion. The evidence sustains a finding that plaintiff's mother and the half-breed, claimed by plaintiff to be his father, were divorced four years before plaintiff was born, and that he is not the son or an heir of the half-breed.

(3) There was no abuse of discretion in refusing a new trial because of alleged newly discovered evidence.

Action in the district court for St. Louis county to determine adverse claims to certain vacant and unoccupied land. The separate answer of defendant Maher alleged that he was the owner in fee simple of an undivided one-third interest in the land, and the separate answer of R. Noble Day alleged that he was the owner in fee simple of an undivided two-thirds interest in the land. The case was tried before Cant, J. who made findings and ordered judgment in favor of defendants. Plaintiff's motion for a new trial was denied. From the judgment entered pursuant to the order for judgment, plaintiff appealed. Affirmed.

*F. D. McMillen,* for appellant.

*H. G. Gearhart* and *C. O. Baldwin,* for respondents.

BUNN, J.

This is an action to determine adverse claim to real estate in St. Louis county. The land, the title to which is in controversy, was patented by the United States to the heirs of Alexis La Framboise. Plaintiff claims that he is the son and heir of Alexis and therefore the owner of the land. At the time of his death, Alexis, who was a Sioux Indian of the half-blood, owned certain Sioux scrip which gave him a right to select and receive a patent for a given amount of government land. After his death, Ellen Cekiya, claiming to be his widow and sole heir, and the sole heir of their children, gave to one Burke a power of attorney to locate the scrip and sell the land when located and patented. The power to locate was exercised and the patent issued, as before stated. Burke then conveyed the land to defendant Day, who conveyed an undivided one-third to defendant Maher.

The issue is as to whether plaintiff is the son and heir of Alexis La Framboise. If he is, his claim of title to an undivided two-thirds of the land must be sustained. If he is not, the title of defendants is good.

This is conceded. The trial court found that plaintiff was not the son of Alexis. He was admittedly the son of an Indian woman named Quana or Emma, who was once the wife of Alexis, but the court found that Alexis and Emma were divorced four years before the birth of plaintiff. The whole case turns on the question whether this so-called divorce, which was according to Indian customs, will be recognized by the courts as valid, as severing the marital relations of Alexis and Emma. The proper decision of this question, as we shall see, depends to a great extent upon the facts. The trial court found these as follows:

The father of Alexis La Framboise was a full-blooded Canadian Frenchman, the mother a Sioux Indian of the full-blood. Alexis was born near Fort Ridgeley, Minnesota. He became, and was at the time of his marriage, sufficiently educated in the English language to converse and write therein, and for a time served in a clerical capacity in a general merchandise store. He associated with the Sisseton-Wahpeton and Santee bands of Sioux Indians some of the time, adopted some of their customs, and was carried on the rolls of the United States government as a mixed-blood of the Sioux tribe of Indians. The scrip, under a part of which the land in controversy was located near the place of his birth, was so-called Sioux half-breed scrip, and was issued by the government to Alexis as a mixed-blood of the Sioux tribe. In 1859 Alexis duly intermarried with one Quana, or Emma, a Sioux Indian maiden, and for a time they lived together as husband and wife. During this time two children were born to them, both of whom died in infancy. In 1863 the marriage relation between Alexis and Emma was duly terminated. Thereafter and during the year 1867 plaintiff was born to Emma, and is her son. He is not the son or heir of Alexis.

As conclusions of law the court determined that defendants are the owners in fee of the land in dispute, and that plaintiff has no right, title or interest therein, and ordered judgment accordingly. Plaintiff made a motion for a new trial, assigning as grounds that the decision was not justified by the evidence and was contrary to law, that there were errors in certain rulings on the trial, and newly discovered evidence. The motion was denied, judgment was entered on the decision, and this appeal taken from the judgment.

The assignments of error raise two main questions for decision: Was the evidence sufficient to sustain the finding that the marriage relation between Alexis and Emma was duly terminated?

Was it error to refuse to grant a new trial because of newly discovered evidence?

1. Before taking up consideration of these questions we will dispose of the claim of plaintiff that the evidence to show an Indian divorce was not admissible under the pleadings. This is not difficult. The complaint alleged that Alexis La Framboise died intestate, leaving Emma La Framboise, his widow, and plaintiff his son, his sole surviving heirs at law. This allegation was met by a general denial. There can be no doubt that any evidence to show that Emma was not the widow of Alexis, or that plaintiff was not his son or heir, was admissible under the general denial. Evidence to prove a divorce went directly to this issue, and was properly received against the objection that divorce had not been pleaded.

2. The first real question on the merits is as to the validity of the Indian divorce. The claim is that the evidence to prove an Indian divorce was incompetent and legally insufficient to show that there was a divorce which the courts will recognize as terminating the marriage relation between Alexis and his Indian wife. The evidence does not leave a doubt that the parties were divorced if an Indian divorce will be recognized. According to the custom of the Sioux Indians an Indian marriage might be terminated, and either party be at liberty to marry again, by mere abandonment, without further ceremony. Alexis abandoned Emma in 1863, and the evidence, though conflicting, sustains a finding that he did not return to her but took another wife. Whether the marriage relation between Alexis and Emma was "duly terminated" by this Indian divorce, as the trial court found it was, is an interesting question. Alexis was a half-breed, as stated. He was recognized by the Sisseton-Wahpeton band of Sioux as a member of the tribe; adopted its customs; lived and associated with its members; was on the rolls of the United States government, and received rations as a member thereof. As a Sioux half-breed the government issued to him the scrip which entitled his heirs to the land involved herein. He lived according to the Indian

customs, and when he "bought" Quana, niece of Chief Other Day of the Shakopee band of Sioux, and took her to live with him, it was a marriage according to the Indian customs. That the courts of this state recognize this as a valid marriage is settled by Earl v. Godley, 42 Minn. 361, 44 N. W. 254, 7 L.R.A. 125, 18 Am. St. 517. It was not a "common law" marriage, so-called, but a marriage according to the custom and laws of the tribe to which the parties belonged. This case is not, however, entirely decisive on the question of the validity of the Indian divorce. But we think it is correct, and in accord with the authorities elsewhere, to say that a divorce according to the Indian customs and laws terminates the marriage relation so long as the parties are still members of Indian tribes recognized by the government as distinct political communities. That the Sioux tribes were so recognized at the time Alexis married Quana there is no doubt. Earl v. Godley, supra, citing U. S. v. Shanks, 15 Minn. 302 (369). That both Alexis and Quana were still members of the tribe, and subject to its laws, at the time the former left to take another woman, is also clear. After their marriage they hunted and lived as Indians near Redwood. They were both brought as prisoners to Fort Snelling at the time of the Indian outbreak, and lived in a camp near the fort with the other prisoners while a "pen" was being constructed to inclose them. Alexis and Quana did not "come into the pen with the rest of them," but moved to Mendota where they lived during the winter. In the spring Alexis went off with the "other woman." There is evidence that he returned to Quana afterwards, but we will not go into a discussion of the testimony of Quana and the other Indian witnesses beyond saying, as we have already said, that the court was warranted in finding that Alexis never lived with Quana after he left her at Mendota, but at all times thereafter lived with Yohada or Ellen as his wife, their relation being recognized by the Indians.

Counsel for plaintiff seems to concede that the evidence to prove a divorce would have been competent and sufficient for the purpose if Alexis had been a full-blooded Indian, and perhaps if he had been adopted into the tribe. He contends that Alexis was a white man, looked and dressed like one, and was treated by the Indians as one. For these reasons plaintiff argues that the case is as it would be where a white man takes

an Indian wife and lives with her in civilization. It is probably correct that in such a case a divorce by mere abandonment would not be recognized as valid. But we do not think the facts are as plaintiff claims. Alexis was a half-breed and we are not informed what steps were necessary to his adoption into an Indian tribe. He lived with the Indians and seems to have been recognized by them as one of them. We do not think it material that he could read, at one time worked in a store, or that the evidence leaves in some doubt his attitude in the uprising. On the whole he lived the life of an Indian, and observed their customs, particularly in the matter of buying and abandoning their women. Nor is it important that Alexis did not live on an Indian reservation. There were none at the time of his marriage or divorce. That all lands in that part of the state where Alexis and Quana were living at the time of the alleged divorce had been relinquished by the Indians, and that during the outbreak and for some years thereafter all treaties with the Sisseton-Wahpeton and other bands of the Sioux were abrogated, are facts that do not seem to us at all controlling. If they are, the result would be the invalidity of all Indian marriages and divorces during the period.

The decisions as to the validity of Indian divorces are not wholly in accord. It is uniformly held that so long as Indians live together under the tribal relation and tribal government they are not subject to the laws of the state, but only to the jurisdiction of Congress. They have uniformly been regarded by the government and by the courts as dependent governments subject to the will of Congress and under the laws of the United States. Under the laws of the United States they are recognized as capable of managing their own affairs, including their domestic relations, and those persons who were recognized by the Indian custom and law as married persons, must be treated so by the courts. Earl v. Godley, supra, and cases cited; Cyr v. Walker, 29 Okl. 281, 116 Pac. 931, 35 L.R.A.(N.S.) 795, and cases in note. This principle clearly applies to divorce. There is little doubt but that a divorce according to Indian custom is valid, where the acts by which it is alleged to have been effected take place while the parties continue to reside in Indian territory and where the marriage was contracted therein. Some of the cases go further than this, as does Cyr v. Walker, where a white man who had been adopted

by the Pottawatomie tribe of Indians in Indiana, came to Illinois and there married a white woman, and they lived together as husband and wife for several years. The man thereafter came to the Pottawatomie reservation in Indian territory, where he lived as a member of the tribe. The decision that his divorce, according to the customs of the tribe, would be treated as valid by the courts does not meet our approval, but it indicates how far courts have gone to sustain Indian divorces. The authorities are discussed in the note in 35 L.R.A. (N.S.) 795-802, above referred to. See also Buck v. Branson, 34 Okl. 807, 127 Pac. 436, 50 L.R.A. (N.S.) 876. They make no distinction between cases where the husband is a full-blooded Indian, and where he is a half-breed or even a white man. If he marries an Indian woman and lives with her in the tribal haunts, and is there divorced according to the Indian custom, the same principle which recognizes the marriage as valid and the children as legitimate, also recognizes the divorce. It is different, we think, where the parties leave the Indian haunts and customs, and go to dwell in civilization. They then become subject to the laws of civilization. As the facts are in the present case we think the divorce must be recognized. Alexis and Quana had not abandoned the roving Indian life for the haunts of civilization. They had not severed whatever the ties were that bound them to the Sioux. As said in Earl v. Godley (42 Minn. 362), where the tribal relation is still recognized by the government as existing, "the fact that their primitive habits have been modified by their intercourse with the whites does not authorize a state to treat them as subject to its laws in respect to their relations and dealings with each other. The Kansas Indians, 5 Wall. 737" [18 L. ed. 667].

We hold that the trial court correctly held that the marriage relation between Alexis and Quana was "duly terminated" in 1863, and that the finding that plaintiff was not the son of Alexis is sustained by the evidence.

3. The facts as to the alleged newly discovered evidence are these: The case was tried before Judge Dibell in December, 1912. There was some delay in submitting briefs, and because of an effort to supply an omission in the transcript of the evidence which had been taken. Before the case could be decided Judge Dibell resigned to become a member of this court. Plaintiff's counsel knew, at the time of the trial before Judge

136 M.—17

Dibell, that there was in existence a Bible containing a record of the children born to Alexis and Quana, and claimed that it showed plaintiff as one of these children. He did not procure this Bible until after the case was closed, but seems to have done so in time to have submitted it to the court with the testimony which had been omitted from the transcript. Counsel for defendant offered to allow the Bible to go in if plaintiff would consent to supply the omission in the testimony. Plaintiff's counsel declined the offer, apparently not then considering the entries in the Bible as of any importance. He made no effort whatever to get the evidence before the court before the final decision of Judge Cant, though it seems plain enough that such an effort would have met with success. It requires nothing beyond the above statement to show that the alleged newly discovered evidence would not have justified a new trial, much less was it error to refuse a new trial on this ground.

Order affirmed.