## McMURRY et al. v. PRODUCERS' OIL CO. et al.

(District Court, E. D. Oklahoma. August 12, 1922.)

### No. 2768.

Indians ⚖══16(3), 18—Allotment of half-blood creek Indian, freed from restrictions, held to descend according to state law; unrestricted land of half blood, descending to full blood, held subject to departmental supervision.

Where at the death of a half-blood Creek Indian, single and without issue, in 1919, his surplus land was free from restrictions, it descended according to Rev. Laws Okl. 1910, § 8418, half to his mother and half to his father, and the half interest of the mother, a full-blood Creek citizen, in oil and gas lease of the land, was subject to the supervision of the Department of the Interior, in view of Act March 1, 1901, § 7, Act May 27, 1902, Act April 26, 1906, and Act May 27, 1908.

In Equity. Suit by Joe McMurry and Albert N. Davidson, guardians, against the Producers' Oil Company and others. Decree as stated in opinion.

Grant Foreman and J. D. Simms, both of Muskogee, Okl., for complainant.

Frank Lee, U. S. Atty., and O. H. Graves, Sp. Asst. U. S. Atty., both of Muskogee, Okl., for defendant Locke.

WILLIAMS, District Judge. On August 10, 1921, complainants filed their bill praying for the issuance of an injunction against the Superintendent for the Five Civilized Tribes receiving or attempting to receive or collect royalties under a certain oil and gas lease covering the surplus allotment of Robert Pitman, Jr., and asking for a judgment against the defendants the Producers' Oil Company and the Texas Company in the sum of $10,498.19 for certain royalties due under said lease.

On March 7, 1922, the Superintendent of the Five Civilized Tribes, by ancillary petition, procured a temporary restraining order which required the proceeds from the sale of the renewal of the oil and gas lease on said surplus allotment to be paid over to said Superintendent.

Issue having been joined in the pleadings as to all matters, the cause has been submitted on an agreed state of facts, as follows:

"* * * That Robert Pitman, Jr., * * * enrolled as a half-blood Creek Indian, * * * and * * * allotted to him as a part of his surplus land, * * *" and that his guardian "made oil and gas leases covering the above-described land (part of his surplus allotment) on April 1, 1907, and that the leases were approved by the Secretary of the Interior on May 22, 1907. * * * On August 2, 1912, Dana H. Kelsey, predecessor in office of Victor M. Locke, Jr., advised the guardian of Robert Pitman, Jr., a minor, that all restrictions on the land had been removed, and that thereafter settlement for the royalty under the terms of the lease should be made to the guardian of said minor, or to the minor himself when he became of age, * * * and at the same time said Dana H. Kelsey, superintendent and predecessor of Victor M. Locke, Jr., defendant herein, notified the lessee oil company that restrictions had been removed, * * * and at the same time notified the Southwestern Surety Insurance Company, being the company having executed the bond to guarantee the payment of all royalties and rentals under the terms of said

⚖══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

lease, that restrictions had been removed; * * * that on October 8, 1919, the said Robert Pitman, Jr., died, single, unmarried, and without issue, and that at the time of his death he was a resident of Delta county, Colo.; that he was living with his father Robert Pitman, Sr.; * * * that at the time of the death of Robert Pitman, Jr., Robert Pitman, Sr., the father, and Lucinda Pitman, the mother, were living separate and apart, having been divorced by a decree of divorce by the district court of El Paso county, Colo., on February 24, 1911, and that thereafter the said Robert Pitman, Sr., the father, and Lucinda Pitman, the mother, of Robert Pitman, J., lived separate and apart, and were so living separate and apart on October 8, 1919, being the date of the death of Robert Pitman, Jr., and that the said Lucinda Pitman was on said October 8, 1919, living in Tucson, Ariz., and at that time her legal residence was in Muskogee, Okl.; * * * that the said Robert Pitman, Sr., is a white man and a noncitizen of the Creek Tribe of Indians; that he is without Indian blood and was never adopted as a member of the tribe, and that Lucinda Pitman, the mother of Robert Pitman, Jr., is a full-blood member of the Creek Tribe of Indians, and duly enrolled as such; * * * that the amount of royalty accruing since the date of the death of Robert Pitman, Jr., up to the date of filing of complaint is the sum of $10,864.05; * * * that the regulations prescribed by the Secretary of the Interior for the purpose of carrying into effect the provisions of the act of Congress approved April 26, 1906 (34 Stat. 137), * * * with regard to the leasing for oil and gas and the collection of the royalty is as follows: 'All leases executed and approved heretofore or hereafter on land from all of which restrictions against alienation have been or shall be removed, even if such leases contain provisions authorizing supervision by this Department, shall, after such removal of restrictions against alienation, be operated entirely free from such supervision, and the authority and power delegated to the Secretary of the Interior in said leases shall cease, and all payments required to be made to the Superintendent for the Five Civilized Tribes shall thereafter be made to lessor or the then owner of said land, and changes in regulations thereafter made by the Secretary of the Interior applicable to oil and gas leases shall not apply to such leased land from which said restrictions are removed, except, where a bond is required in said lease, it shall be furnished with responsible surety, unless the giving of said bond is waived by the lessor or. the owner of the land;' * * * that subsequent to the date of the letter of notification mailed by Dana H. Kelsey, Superintendent and predecessor in office of Victor M. Locke, Jr., and Superintendent for the Five Civilized Tribes, * * * all royalties accruing under the lease from the date of such letters until the date of the death of Robert Pitman, Jr., were paid direct to the guardian of Robert Pitman, Jr., without the intervention and supervision in any form of the Superintendent for the Five Civilized Tribes, or any of his employees, servants, or agents; that Lucinda Pitman has been duly adjudged an incompetent; and that Joe McMurry and Albert H. Davidson are her duly qualified and acting guardians."

On March 8, 1920, Robert Pitman, the father of decedent Robert Pitman, Jr., by proper and valid quitclaim deed conveyed to Lucinda Pitman, his former wife and the mother of said decedent, all of his interest in and to said land covered by said oil and gas lease. On March 7, 1922, the Texas Company offered to pay the sum of $60,000 for the execution of an oil and gas lease covering the land involved herein, the former lease having expired. The guardians, with the approval of the county court, accepted said offer and executed such oil and gas lease to said company. By reason of a temporary restraining order issued by this court at the instance of the defendant Victor M. Locke, Jr., Superintendent for the Five Civilized Tribes, said sum of $60,000 was deposited with him to abide the determination of this action. The following questions arise on this record: (1) As to wheth-

er the mother inherited said land to the exclusion of the father; (2) as to whether the Department of the Interior has supervision of the interest of the mother in said oil and gas lease, she being a full-blood Creek citizen.

"The homestead of each citizen shall remain after the death of the allottee, for the use and support of children born to him after the ratification of this agreement, but if he have no such issue, then he may dispose of his homestead by will, free from limitation herein imposed, and if this be not done, the land shall descend to his heirs according to the laws of descent and distribution of the Creek Nation free from such limitation." Section 7, Act March 1, 1901 (31 Stat. 864).

See, also, Act May 27, 1902 (32 Stat. ch. 888, p. 258).

In Woodward v. De Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310, it is said:

"That section [section 7 of Original Creek Agreement] begins by saying that 'lands allotted to citizen hereunder' shall not be incumbered or sold to secure or satisfy any debt contracted prior to the date of the deed to the allottee, and shall not be alienable within five years from the ratification of the agreement except with the approval of the Secretary of the Interior. Then follow clauses imposing restrictions solely upon the homestead 40 acres, and the section ends by declaring that the homestead shall remain, after the death of the allottee, for the use and support of children born to him after the ratification of the agreement, but in the absence of such issue 'he may dispose of his homestead by will, free from limitation herein imposed, and if this be not done, the land shall descend to his heirs, according to the laws of descent and distribution of the Creek Nation, free from .such limitation.' It is reasonable to suppose that the Indians, when giving approval to this agreement, would understand that the land which was thus to descend free from limitation included as well the land to which the limitation had never applied as that to which it had applied, but respecting which it had expired. And they would understand the provisions of section 28 (if limited as is here contended) to apply the laws of descent and distribution of the Creek Nation to allotments made under the peculiar circumstances there provided for, in order to bring those allotments into conformity, as to descent and otherwise, with allotments of the general class, including allotments made prior to the ratification of the agreement, which by section 6 were 'as to appraisement and all things else' to be governed by the provisions of the agreement. Such was the view expressed by the Supreme Court of Oklahoma in De Graffenried v. Iowa Land & Trust Co. (1907) 20 Oklahoma, 687, 709–711."

Under this holding, the term "the land shall then descend to the heirs, according to the laws of descent and distribution of the state of Oklahoma, free from all restrictions" and without any qualification as to Creek citizenship or Creek descendant, comprehended all land allotted to allottees of the Creek Nation. Homesteads of all members of the Five Civilized Tribes having half or more Indian blood are restricted as to alienation, and all other homesteads, as well as all surplus allotments, except those of full bloods, are freed from restrictions. Section 1 of Act May 27, 1908 (35 Stat. 312).

However, if it be held that the term "the land," as used in said second proviso of said section 9, applied only to such restricted homesteads (Woodward v. De Graffenried, 238 U. S. 315, 316, 35 Sup. Ct. 764, 59 L. Ed. 1310), still did Congress intend that such restricted homesteads should descend without qualification as to Creek citizenship in accordance with the laws of descent and distribution of the state of

Oklahoma, and that·unrestricted homesteads and both restricted and unrestricted surplus allotments should descend in accordance with the laws of the state of Oklahoma, with the qualification that only Creek citizens and their Creek descendants should inherit? Would it not be more reasonable to conclude that Congress intended that all unrestricted lands allotted to members of the Creek Tribes as allottees should descend without qualification in accordance with the state law (Rev. Laws Okl. 1910, § 8418)?

Section 46 of the Original Creek Agreement (Act Cong. March 1, 1901) provides:

"The tribal government of the Creek Nation shall not continue longer than March fourth, nineteen hundred and six, subject to such further legislation as Congress may deem proper." 31 Stat. 872.

And section 1 of said agreement provides that its ratification by the Creek National Council shall be made within 90 days after its approval of said act by the President of the United States (March 1, 1901). These matters are adverted to with a view of determining what is meant by the term "lands of the Creek Nation" as used in section 6 of Act June 30, 1902 (32 Stat. 501). See Woodward v. De Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310; Jefferson v. Fink, 247 U. S. 290, 38 Sup. Ct. 516, 62 L. Ed. 1117.

In the Original Agreement (Act March 1, 1901) the descent of the land is provided for, but in the Supplemental agreement this is extended to include not only the land, but also moneys.

"In early times, when allotments in fee simple to individual Indians were made only occasionally, there was no congressional enactment prescribing who should inherit allotted land on the death of the allottee, and in such cases it was held that while the tribal relation continued the applicable rule of descent was to be found in the laws and usages of the tribe, and not in the laws of the state or territory in which the land lay. Jones v. Meehan, 175 U. S. 1, 29–32. In actual practice this rule proved unsatisfactory, because the tribal laws and usages were generally crude and often difficult of ascertainment; and so in later allotment acts Congress provided that the descent should be according to the state or territorial law. * * * This was the situation when the act of 1901, known as the Original Creek Agreement, was adopted. That act, in the course of providing for the allotment in severalty of the lands of the Creeks, revived their tribal law of descent and distribution [which had been suspended by section 28, Act June 28, 1898] by making it applicable to their *allotments.* [Italics mine.] Sections 7 and 28. But the revival was only temporary, for the act of 1902, known as the Supplemental Creek Agreement, not ony repealed so much of the act of 1901 as gave effect to the tribal law, but reinstated the Arkansas law with the qualification that Creek heirs, if there were such, should take to the exclusion of others. [See Act May 27, 1902, 32 Stat. c. 888, p. 258.] Washington v. Miller, 235 U. S. 422, 425, 426. * * * And this was followed by Act April 28, 1904, c. 1824, 33 Stat. 573, § 2, declaring that all statutes of Arkansas theretofore put in force in the Indian Territory should be taken 'to embrace all persons and estates in said territory, whether Indian, freedmen, or otherwise.'

"Referring to the purpose with which the Arkansas statutes were put in force in that territory and to their status there, this court said in Shulthis v. McDougal, 225 U. S. 561, 571: 'Congress was then contemplating the early inclusion of that territory in a new state, and the purpose of those acts was to provide, for the time being, a body of laws adapted to the needs of the locality and its people in respect of matters of local or domestic concern. There being no local Legislature, Congress alone could act. Plainly its action was intended to be merely provisional. * * *'

"By the enabling act of June 16, 1906 (chapter 3335, 34 Stat. 267), provision was made for admitting into the Union both the territory of Oklahoma and the Indian Territory as the state of Oklahoma. Each territory had a distinct body of local laws. Those in the Indian Territory, as we have seen, had been put in force there by Congress. Those in the territory of Oklahoma had been enacted by the territorial Legislature. Deeming it better that the new state should come into the Union with a body of laws applying with practical uniformity throughout the state, Congress provided in the enabling act (section 13) that 'the laws in force in the territory of Oklahoma, as far as applicable, shall extend over and apply to said state until changed by the Legislature thereof,' and also (section 21) that 'all laws in force in the territory of Oklahoma at the time of the admission of said state into the Union shall be in force throughout said state, except as modified or changed by this act or by the Constitution of the state.' The people of the state, taking the same view, provided in their Constitution (article 25, § 2) that 'all laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law.'

"The state was admitted into the Union November 16, 1907; and thereupon the laws of the Territory of Oklahoma relating to descent and distribution (Rev. Stats. Okl. 1903, c. 86, art. 4) became laws of the state. Thereafter Congress, by Act May 27, 1908, c. 199, 35 Stat. 312, § 9, recognized and treated 'the laws of descent and distribution of the state of Oklahoma' as applicable to the lands allotted to members of the Five Civilized Tribes."

Jefferson v. Fink, 247 U. S. 290, 38 Sup. Ct. 517, 62 L. Ed. 1117.

In Jefferson v. Fink, supra, it is further said:

"Through congressional action the Arkansas law found in chapter 49 of Mansfield's Digest had become the local law of descent in the Indian Territory, and when the act of 1902 provided that the descent of Creek allotments should be in accordance with that chapter, it was but another way of saying that the descent should be in accordance with the local law. In other words, that act was made to conform to the general policy of Congress in respect to the descent of Indian allotments. Other provisions dealt with the estate which the allottee was to receive and showed that it was to be a fee simple. What was said about the rules of descent was purely legislative, not contractual; and its presence in the act gave it no effect that it would not have had as a separate enactment. Like other rules of descent. it was subject to change by the lawmaking power as to any land not already passed to the heir by the death of the owner. Not until the ancestor dies is there any vested right in the heir."

By section 22 of Act April 26, 1906, the adult heirs of any deceased Indian of either of the Five Civilized Tribes, the selection of whose allotment has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and, if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States court for the Indian Territory, and, in case of the organization of a state or territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. But all conveyances made under said section by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior under such rules and regulations as he may prescribe.

By section 23 of said act, every person of lawful age and sound mind may by last will and testament devise and bequeath all of his or her estate, real and personal, and all interest therein, with the limitation or proviso that no will of a full-blood Indian devising real estate shall be valid, if such last will and testament disinherits the parent, wife, spouse, or children of such full-blood Indian, unless acknowledged before and approved by a judge of the United States Court for the Indian Territory or a United States commissioner.

By section 4 of act of May 27, 1908, all lands from which restrictions have or shall. be removed "shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes" with the limitation "that allotted lands shall not be subjected or held liable, to any form of personal claim, or demand, against the allottees arising or existing prior to the removal of restrictions, other than contracts heretofore expressly permitted by law."

By section 6 the persons and property of minor allottees, except the restricted allotments of living minors might not be sold by order of said courts, were subject to the jurisdiction of the probate courts of the state of Oklahoma without any supervision of the Secretary of the Interior except as to oil and gas leases as provided in section 2 of said act.

By said section 6 the Secretary of the Interior is empowered to appoint local representatives in the state of Oklahoma to investigate the conduct of guardians or curators having in charge the estates of such minors who shall have power to take steps to prosecute any necessary actions, civil or criminal, to preserve the property and protect their interest, etc.

Section 23 of the act of April 26, 1906, is so amended by the act of May 27, 1908, as to permit the judge of the county court of the state of Oklahoma to approve wills of full-blood Indians.

The term "lands of the Creek Nation," as used in section 6 of the Supplemental Creek Agreement (Act June 30, 1902), comprehended the allotments made to members of said tribe as provided for in the Original Creek Treaty (Act March 1, 1901). All allotments to be made under the terms of section 7 of said original Agreement were restricted as against alienation and to so remain for the period of five years from the date of the ratification of the treaty which was to be made by July 1, 1901, when such restrictions were intended to be freed from the surplus allotments; for, if said treaty was to be ratified, it was to be done within three months from March 1, 1901 (see section 1, Act March 1, 1901), and the tribal government of the Creek Nation was not to continue longer than March 4, 1906 (see section 46, Act March 1, 1901), but subsequently and prior to July 1, 1906, by act of Congress, said date was extended, and the tribal government is still in existence.

Section 1 of the enabling act (Act June 16, 1906) is not a grant from the state to the federal government, but an express reservation of existing federal authority. Coyle v. Oklahoma, 221 U. S. 568, 31 Sup. Ct. 688, 55 L. Ed. 853. As long as the Creek Tribe of Indians

as a nation existed and the intestate remained a member thereof it is within the power of Congress to reimpose restrictions on said allotment theretofore freed therefrom for the purpose of protecting said ward. Brader v. James, 246 U. S. 88, 38 Sup. Ct. 285, 62 L. Ed. 820, Ann. Cas. 1918E, 469; McCurdy v. United States, 246 U. S. 263, 38 Sup. Ct. 289, 62 L. Ed. 706; Sunday v. Mallory, 248 U. S. 545, 39 Sup. Ct. 135, 63 L. Ed. 414. To my mind it is not a question of authority of Congress to provide as to the descent, but what Congress intended by this legislation.

In Dickson v. Luck Land Co., 242 U. S. 371, 37 Sup. Ct. 167, 61 L. Ed. 371, it is said:

"With those restrictions entirely removed and the fee-simple patent issued, it would seem that the situation was one in which all questions pertaining to the disposal of the lands naturally would fall within the scope and operation of the laws of the state. And that Congress so intended is shown by Act May 8, 1906, c. 2348, 34 Stat. 182, which provides that, when an Indian allottee is given a patent in fee for his allotment, he 'shall have the benefit of and be subject to the laws, both civil and criminal, of the state.' Among the laws to which the allottee became subject, and to the benefit of which he became entitled, under this enactment, were those governing the transfer of real property, fixing the age of majority and declaring the disability of minors."

This case involves the act of March 1, 1907 (34 Stat. 1015), and of May 8, 1906 (34 Stat. 182). The former provides:

"That all restrictions as to the sale, incumbrance, or taxation of allotments within the White Earth Reservation in the state of Minnesota, heretofore or hereafter held by adult mixed-blood Indians, are hereby removed, * * * or such mixed bloods upon application shall be entitled to receive a patent in fee simple for such allotments." 34 Stat. 1034.

The latter provides that, when an Indian allottee is given a patent in fee for his allotment, he "shall have the benefit of and be subject to the laws, both civil and criminal, of the state."

The provisions relating to descent and distribution as contained in section 7 of the act of March 1, 1901, and (Indian Appropriation Bill) the act of May 27, 1902, and section 6 of the act of June 30, 1902, at the time of their adoption, where the allottees were then living, comprehended only restricted allotments, as no allotted lands in the Creek Nation were then freed from restrictions, except in cases where the Creek citizen had died after April 1, 1899, and children born after July 1, 1900, and died after said date and prior to allotment, the allotment was made under section 28, Act March 1, 1901, to the heirs.

The Original Creek treaty and the Supplemental treaty and various acts herein referred to all antedating June 16, 1906, were enacted with a view of preparation for early statehood. See, also, Act May 27, 1902, 32 Stat. c. 888, p. 258.

Section 2 of the enabling act (Act June 16, 1906, 34 Stat. 268), which provides:

"That all male persons over the age of 21 years, who are citizens of the United States, or who are members of any Indian nation or tribe in said Indian Territory and Oklahoma * * * are hereby authorized to vote for and choose delegates to form a constitutional convention for said proposed state; and all persons qualified to vote for said delegates shall be eligible to serve as delegates * * *"

—shows a plan and purpose on the part of Congress that all members of the Indian tribes located in said proposed state should participate in its erection and be subject to its laws, both civil and criminal, except where expressly or by necessary implication otherwise provided.

> "It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated. * * * The power of the state in this respect follows from her sovereignty within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the federal government. The title and modes of disposition of real property within the state, whether inter vivos or testamentary, are not matters placed under the control of federal authority. Such control would be foreign to the purposes for which the federal government was created, and would seriously embarrass the landed interests of the state." United States v. Fox, 94 U. S. 315, 24 L. Ed. 192.

See, also, Biddle v. Green, 8 Wheat. (21 U. S.) 1, 5 L. Ed. 547; Mager v. Grima, 8 How. (49 U. S.) 490, 12 L. Ed. 1168; Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346; United States v. Perkins, 163 U. S. 625, 16 Sup. Ct. 1073, 41 L. Ed. 287; Magoun v. Illinois Trust & Savings Bank, 170 U. S. 288, 18 Sup. Ct. 594, 42 L. Ed. 1037; United States v. Sandoval, 231 U. S. 38, 34 Sup. Ct. 1, 58 L. Ed. 107.

The surplus allotment of the intestate, Robert Pitman, Jr., was freed from every restriction as to alienation, and he was permitted unqualifiedly to devise or bequeath same and expressly subjected to "civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes," with the only qualification that it should not be "subjected or held liable to any form of personal claim or demand against" him "arising or existing prior to the removal of restrictions," except as should be expressly permitted by act of Congress, and subjecting same to involuntary alienation for public and private claims arising after date of removal of restrictions.

The word "inalienable," as used to restrict the disposition of lands in the agreements or alloting acts with the Five Civilized Tribes, includes disposition by will. Hayes v. Barringer, 168 Fed. 221, 93 C. C. A. 507; Taylor v. Parker, 235 U. S. 42, 35 Sup. Ct. 22, 59 L. Ed. 121. See, also, Vining v. Willis, 40 Kan. 609, 20 Pac. 232, which in effect holds that as a general rule a will has the effect to pass title in effect by succession. And to the same effect is Gray v. Coffman, Fed. Cas. No. 5,714. The will as a rule, as authorized by designation of the owner of property prior to death, provides for succession, whilst by the act of sovereign power by means of legislation an inheritance or succession in estates is provided for.

That Congress may grant the power of alienation without the allotment being subjected to the laws of descent and distribution of the state in which it is located as long as the tribal relationship exists may be conceded. Whilst Congress may make such provision, its intent to do so should be clearly manifested. The allottee is not only a citizen of the United States, but also a citizen of the state. Congress has manifested a purpose that such citizen should participate in the erec-

tion of the state and in the determination of what laws should be in force in the state after its erection.

The presumption is that such allotment, freed from restrictions, the allottee being such citizen and subject to both the civil and criminal laws of the state as herein indicated, at the death of such allottee, descended in accordance with the laws of the state without qualification. The burden is on the defendant to show either expressly or by necessary implication to the contrary. Goudy v. Meath, 203 U. S. 146, 27 Sup. Ct. 48, 51 L. Ed. 130.

Again, in Jefferson v. Fink, supra, it is said:

" * * * Congress by the Act of May 27, 1908, c. 199, 35 Stat. 312, § 9, recognized and treated 'the laws of descent and distribution of the state of Oklahoma' as applicable to lands allotted to members of the Five Civilized Tribes."

I conclude that the mother, Lucinda Pitman, acquired a half interest in said surplus allotment of her son, the said Robert Pitman, Jr., by inheritance, and the other half by purchase from her former husband, he having acquired said half interest by inheritance.

Under the facts disclosed by the record, the oil and gas lease covering said surplus allotment of said intestate was not subject to the jurisdiction or supervision of the United States government at the time of the death of said intestate, Robert Pitman, Jr., and only a half interest in the royalty accruing after the death of the said allottee or intestate and a half interest in the bonus for the renewal of the oil and gas lease is subject to the control and supervision of the United States government. Parker v. Richard, 250 U. S. 235, 39 Sup. Ct. 442, 63 L. Ed. 954; La Motte v. U. S., 254 U. S. 570, 41 Sup. Ct. 204, 65 L. Ed. 410.

This holding does not conflict with that in United States v. Smith (D. C.) 279 Fed. 136, for there the lot or tract of land was not embraced within the term "allottee's land." Here the tract of land is a part of the "allottee's land" as the term is used in said section 9 of the act of May 27, 1908.

A decree may be prepared by counsel in accordance with the conclusions herein announced.