## KUNKEL et al. v. BARNETT et al.

(District Court, N. D. Oklahoma. January 26, 1926. On Rehearing, March 22, 1926.)

### No. 60.

1. Indians ⬅18—Succession to lands owned by Indians controlled by state statute.

Right of succession to lands owned by Indians is controlled by state inheritance statute, Comp. St. Okl. 1921, § 11301, subd. 2.

2. Divorce ⬅326—Divorce of Indians and subsequent marriage of one of parties held valid.

Divorce between Indians by mutual consent, in accordance with a proven custom of tribe while tribal relation existed, *held* valid, and a subsequent marriage by one of said parties valid, as affecting title to land, notwithstanding existence at time of an Indian law regulatory of divorces.

### On Rehearing.

3. Indians ⬅18—Allotment does not create ancestral estate, or estate by inheritance, but one by purchase, as affects right of heir not of the blood of the allottee to inherit.

An allotment of land to Indian by blood, as affects descent and distribution, does not create estate by inheritance, or ancestral estate, but by purchase, and heir not of the blood of deceased allottee is entitled to inherit the individual allotment.

In Equity. Suit by W. A. Kunkel and others against Tucker Barnett and others. Decree for plaintiffs.

West, Gibson, Sherman, Davidson & Hull, of Tulsa, Okl., for plaintiff, and cross-petitioner Prairie Oil & Gas Co.

Lewis C. Lawson, of Holdenville, Okl., for defendant Barnett.

KENNAMER, District Judge. This is an action to quiet title to certain lands, and is before this court for the determination of those questions for which the case was remanded. The facts in the case are substantially as set forth in the case of Barnett v. Kunkle, 256 F. 644, 168 C. C. A. 38, and in brief are that one Annie Bird, a full-blood Creek Indian, died in September, 1909, intestate and without issue, seized of the lands in question as her allotment. She left surviving her Tucker Barnett, her father, an alleged husband, Jimmie Bird, with whom she had lived for years, and a sister. January 26, 1910, Tucker Barnett conveyed the land by warranty deed to one Lake Moore, under whom plaintiffs claim. On January 11, 1913, Jimmie Bird, the alleged husband of Annie Bird, conveyed the land by quitclaim deed to one Litchfield, from whom plaintiffs afterwards obtained title.

[1] It has been determined that the inheritance from Annie Bird was controlled by the statute of inheritance of Oklahoma. Jefferson v. Fink, 247 U. S. 288, 38 S. Ct. 516, 62 L. Ed. 1117; Barnett v. Kunkle, supra. Compiled Oklahoma Statutes 1921, § 11301 (second): "If the decedent leave no issue, the estate goes one-half to the surviving husband or wife, and the remaining one-half to the decedent's father or mother, or, if he leave both father and mother, to them in equal shares. * * * If decedent leave no issue, nor husband nor wife, the estate must go to the father or mother, or if he leave both father and mother, to them in equal shares." The sole question presented to this court is whether Jimmie Bird was the husband of Annie Bird, and this involves an inquiry into questions of fact, and a determination as to what controls in determining family status among the Indians of Oklahoma.

The evidence clearly establishes that one Lake Moore purchased the interest in the lands in controversy held by Tucker Barnett. It is clear that the parties to the transaction considered Tucker Barnett the owner of a one-half interest in and to the lands. One-half is all Barnett considered himself the owner of, and one-half is what he contracted to sell, and did sell.

Under the terms of the Oklahoma statute above quoted, Jimmie Bird, if the husband of Annie, was the owner of the remaining half interest in the lands in dispute. We then come to a determination of this question. There is little doubt but that Jimmie Bird and Annie Bird were married in accordance with the custom existing among the Creek Indians. The evidence established that they have lived and cohabited together as man and wife for 10 years or more, and up to the time of the death of Annie. It was conclusively established that they were recognized in the community as man and wife. The record also shows that Jimmie Bird

lived and cohabited with one Betsy as his wife for a short period of time prior to his marriage to Annie, but that they had separated by mutual agreement, and that Betsy had subsequently married one Josey Yarhola, with whom she had lived as man and wife, and they were so recognized. The marriage of Betsy and Josey Yarhola, and the marriage of Jimmie and Annie, after the mutual separation between Betsy and Jimmie, were recognized publicly. These marriages were recognized by the Commission to the Five Civilized Tribes, for Annie is enrolled as Annie Bird, wife of Jimmie Bird, and Betsy is enrolled as Betsy Yarhola, wife of Josey Yarhola.

[2] It is contended that Jimmie Bird was not divorced from Betsy at the time he married Annie, because of the Creek law of 1881, which is as follows: "That a divorce from the bonds of matrimony may be adjudged by the district court of the district where the parties, or either of them, reside, on application, by petition or complaint, of the aggrieved party." It seems quite obvious that Jimmie Bird was not divorced from Betsy according to the terms of the Creek statute, supra. It was established, however, that they were divorced according to the Creek custom, which involved a mutual separation. The custom obtaining among the Creek Indians as to marriage and divorce was clearly proved as facts, and I am of the opinion that, in pursuance of such customs, Jimmie became divorced from Betsy and subsequently became the husband of Annie. This leads to whether the customs existing among the Creek Indians concerning marriage and divorce are to be upheld, in view of an express law providing for divorce of Creek Indians.

The Supreme Court of the state of Oklahoma has gone a great distance to uphold marriages and divorces between tribal Indians, if in accordance with the usages and customs of the particular tribe. The authorities in Oklahoma uniformly hold that marriages according to the custom of the Indian tribe, and the dissolution thereof in accordance with the usages and customs of the tribe, will be held valid. A contrary holding at this time doubtless would disturb many titles based upon this rule, and would make illegitimate many offsprings of such marriages, a result to be avoided, if possible. A number of reasons have been advanced supporting the validity of marriages and divorces among tribal Indians, if in accordance with the customs of the particular tribe,

such as, by reason of such usages and customs, the right of dissolution will be considered a term of the contract of marriage, and either party may take advantage of this term.

Another more or less fallacious argument advanced is that, since marriage according to Indian custom contemplates dissolution by abandonment or mutual consent, a court which upholds the marriage must necessarily uphold the divorce, in order to be consistent. A review of the cases involving this question clearly establish that a divorce according to the Indian custom is valid, where the acts by which it is alleged to have been effected take place while the parties continue to reside in Indian territory, and where the marriage was contracted therein. The Oklahoma Supreme Court has gone so far as to recognize the validity of a divorce of a white man adopted by an Indian tribe, who goes to another state, marries a woman who was not a member of the tribe, and lives there with his wife for several years, but subsequently returns and lives with the tribe upon its reservation, where he divorced the wife according to the usages and customs of the tribe. Cyr v. Walker, 29 Okl. 281, 116 P. 931, 35 L. R. A. (N. S.) 795.

As the question presented in that case is not before this court for consideration, it is not necessary at this time to determine whether the recognition of marriages and divorces according to the usages and customs of the tribes should be extended so far. However, the following cases sustain the propositions that marriages contracted between tribal Indians according to the usages and customs of their tribe, at a time when the tribal government and relations are existing, will be upheld by the courts, in the absence of a federal law rendering invalid the laws and customs of the tribe, and likewise that a dissolution of the marriage contract according to such tribal usages and customs will be likewise upheld. Buck v. Branson, 34 Okl. 807, 127 P. 436, 50 L. R. A. (N. S.) 876; James v. Adams, 56 Okl. 450, 155 P. 1121; Proctor v. Foster, 107 Okl. 95, 230 P. 753; La Framboise v. Day, 136 Minn. 239, 161 N. W. 529, L. R. A. 1917D, 571. For authorities sustaining the general rule that a marriage between Indians contracted in accordance with their tribal customs, and recognized by them as lawful, is held to be valid as a common-law marriage, see the cases collected in a note in Ann. Cas. 1918E, at page 380.

By the custom established, no formal contract or ceremony is essential to a marriage;

a mere meeting and cohabitation as husband and wife constitute marriage. By the same custom a divorce may be effected by separation by mutual consent. I am of the opinion that such marriages and divorces should be recognized as valid, if in accordance with the usages and customs of the tribe, despite the existence of a Creek law providing for divorces. Marriage is provided for by statute in all the states, but, notwithstanding such statutory provisions, common-law marriages are recognized and upheld in a number of the states.

While it is true the decisions are not uniform as to the validity of Indian divorces, it may safely be stated that, so long as the Indians live together under the tribal relation and are not subject to the laws of the state, but only to the jurisdiction of the Congress, and the paramount federal law places no limitation upon such tribes in reference to managing their own affairs, including their domestic relations, marriages and divorces according to the usages and customs of the tribe will be treated as valid by the courts. Earl v. Godley, 42 Minn. 361, 44 N. W. 254, 7 L. R. A. 125, 18 Am. St. Rep. 517; La Framboise v. Day, supra.

It would appear to be a settled principle of law, sustained by the authorities, so long as the tribal relation exists among Indians, and their domestic affairs are not restricted by any applicable state law, to recognize the validity of their custom marriages and divorces. Therefore I am of the opinion that Jimmie Bird was the husband of Annie Bird at the time of her death, and by operation of the Oklahoma statute of inheritance one-half of the lands in controversy passed to Jimmie Bird, who conveyed his interest to parties from whom plaintiffs hold.

The plaintiff, Kunkel, and those who hold under him, have title to the lands in question, having acquired one-half interest therein from Tucker Barnett, and the remaining one-half interest from Jimmie Bird. It therefore becomes unnecessary to go into a consideration of the good faith of the purchasers of the lands.

It is the judgment of the court that the title to the lands described in plaintiff's bill of complaint be quieted in the plaintiff and his grantee, the Prairie Oil & Gas Company, a party to this action.

## On Rehearing.

[3] Counsel for the defendant Tucker Barnett insists that the evidence offered by the plaintiffs is insufficient to show a separation by mutual consent of Jimmy Bird and his first wife, Betsy. Therefore there could be no divorce according to the tribal custom of the Creek Indians. I deem it sufficient to state that, upon re-examination of the record, I cannot agree with the counsel in this contention.

The opinion in the case of Gray v. Chapman et al., filed in the Supreme Court of Oklahoma, January 19, 1926, and reported in 243 P. 522, has been called to my attention in support of petition for rehearing. In this case, the court held: "An allotment of land to a member of the Five Civilized Tribes by blood cannot be termed a nonancestral estate nor a gift, but must be termed an inheritance acquired by the allottee by reason of his membership in the tribe. It was his birthright. It came to him by the blood of his tribal parent, and not by purchase."

This holding appears to be based upon the following authorities: Shulthis v. McDougal, 170 F. 529, 95 C. C. A. 615; Pigeon v. Buck, 38 Okl. 101, 131 P. 1083; Id., 237 U. S. 386, 35 S. Ct. 608, 59 L. Ed. 1007. I cannot agree with the conclusion reached, as reflected in this last opinion in Gray v. Chapman et al., supra. The cases cited in support of the conclusions reached are of very little value in the light of the statutes the courts had under consideration in those cases. These opinions were dealing with chapter 49 of Mansfield's Digest of the Statutes of Arkansas in force in Indian Territory prior to statehood.

The laws of descent and distribution of Arkansas were in many respects different from the laws of descent and distribution found in the Oklahoma statutes. In the first place, the Arkansas law specifically provides for ancestral estates and estates by new acquisition in their general scheme for descent and distribution. Dower is provided for the surviving widow; curtesy for the surviving husband. No such thing as dower and curtesy is known to the Oklahoma statutes of descent and distribution. The opinions of the various courts in determining descent of an individual allotment of a deceased member of one of the Five Civilized Tribes applied an equitable, practical construction of these statutes, but, as held in the case of In re Pigeon's Estate, 81 Okl. 180, 190 P. 309:

"Under said provisions of the Enabling Act and the Constitution, chapter 49 of Mansfield's Digest of the Laws of Arkansas and the provisos of section 6 of the Supple-

mental Creek Agreement of June 30, 1902, qualifying said chapter 49, were repealed, and the devolution of an estate of a deceased Creek allottee, having died since the admission of Oklahoma into the Union, is governed by the laws of descent and distribution of the state of Oklahoma, and noncitizen heirs may inherit."

This case was followed in Teague et al. v. Smith et al., 85 Okl. 12, 204 P. 439; Harrison v. Harrison, 87 Okl. 91, 209 P. 737; Jackson, née Roe, v. McKay et al., 89 Okl. 119, 213 P. 876; Roe v. Anco Oil Co. et al., 96 Okl. 87, 219 P. 922; McKay v. Roe, 96 Okl. 87, 88, 219 P. 921. These cases all appear to be in conflict with the rule announced in Gray v. Chapman, supra,

In the case of In re Pigeon, supra, the court held that the noncitizen heir, the surviving wife of the deceased allottee, was entitled to inherit his estate, his individual allotment, and overruled all former cases holding such estates to be ancestral. It would seem, from a consideration of these cases, following the rule announced in the Pigeon Case, that the doctrine of ancestral estates adheres to a fallacious construction of the Oklahoma statutes, and the creation of such estates may only exist by judicial interpolation into the statutes of something not to be found in the plain language of the various provisions of the Oklahoma statutes of descent and distribution.

It would appear that the Supreme Court of Oklahoma had finally adopted the rule that the Oklahoma statutes of descent and distribution unqualifiedly govern the devolution of Indian estates and that noncitizen heirs may inherit. In the case of Harrison v. Harrison, supra, application for writ of certiorari to the United States Supreme Court was denied. And in the case of McKay v. Roe, supra, the Supreme Court of Oklahoma refused to follow the rule in the case of Hill v. Hill, 58 Okl. 707, 160 P. 1116, which, according to the rule announced in the Pigeon Case, is overruled.

The Pigeon Case, supra, announced the rule that a uniform law of descent and distribution prevailed as to all classes of citizens in Oklahoma subsequent to admission of the state into the Union. No doubt it was the intention of Congress in the Enabling Act that there should be a uniform application of the laws of the territory of Oklahoma extended in force. The rule announced in this case, and followed by numerous cases of the Oklahoma Supreme Court was not referred to in the case of Gray v. Chapman. It therefore will not be assumed that it was intended to overrule these former opinions and adhere to a rule directly in conflict therewith; the rule in the Pigeon Case having been followed in the case of Tiger et al. v. Slinker (United States, Intervener) 4 F.(2d) 714, and in effect approved by the Eighth Circuit Court of Appeals in the case of Locke, Superintendent, v. McMurry et al., 287 F. 276, affirming the District Court of the Eastern District of Oklahoma, 284 F. 181.

From a careful consideration of the case of Shulthis v. McDougal, supra, and similar cases construing and applying the Arkansas laws found in chapter 49, Mansfield's Digest, it is manifest that the courts did not consider the individual allotments of members of the various tribes an estate of inheritance from any ancestor, but regarded such estates more analogous to an ancestral estate than a new acquisition in applying the provisions of the Arkansas statutes of descent and distribution. It is plain that no such necessity exists in the application of the Oklahoma statutes, and such a construction would, in effect, nullify the express provisions of the Oklahoma statutes in the devolution of such estates as the individual allotments of the deceased members of the tribes.

I therefore conclude that the petition for rehearing should be denied; and it is so ordered.