JEFERSON ET AL. *v.* FINK ET AL., ADMINISTRATORS OF SEVERS, ET AL.

ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 242. Argued March 22, 25, 1918.—Decided June 3, 1918.

The policy and legislation of Congress respecting the descent of Indian allotments, particularly in the Five Civilized Tribes, reviewed.

An allotment made under the Supplemental Creek Agreement (Act of June 30, 1902, c. 1323, 32 Stat. 500), before the admission of the State of Oklahoma, to a Creek Freedman who died after the State's admission, descends (as among claimants who are all members of the Creek Tribe) according to the law of that State.

The Oklahoma Enabling Act of June 16, 1906, substituted in this respect the law of the State—i. e., the law of the Territory of Oklahoma as extended to, and as it might be changed by, the State—for the law of Arkansas, Mansfield's Digest, c. 49, which had been adopted provisionally in the Supplemental Agreement (§ 6) and in prior acts; and this substitution is recognized by the Act of May 27, 1908, c. 199, 35 Stat. 312, § 9.

In designating the Arkansas law as the rule of descent, the Supplemental Agreement was not intended and did not operate to confer any vested right of inheritance in respect of allotments made and deeded while such designation remained in force.

A prospective heir acquires no vested right in the land before the death of the ancestor, and the rules of descent are subject to be changed meanwhile by the law-making power.

53 Oklahoma, 272, affirmed.

THE case is stated in the opinion.

*Mr. John T. Hays* and *Mr. James M. Hays* for plaintiffs in error.

*Mr. George S. Ramsey,* with whom *Mr. N. A. Gibson, Mr. Joseph L. Hull, Mr. Edward H. Chandler, Mr. Farrar L. McCain, Mr. Edgar A. de Meules, Mr. Malcolm E. Rosser, Mr. Villard Martin* and *Mr. J. Berry King* were on the brief, for defendants in error.

*Mr. John B. Campbell,* by leave of court, filed a brief as *amicus curiæ.*

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

The title to a Creek allotment is here in controversy. The allotment was made under the Act of March 1, 1901, c. 676, 31 Stat. 861, known as the Original Creek Agreement, and the modifying Act of June 30, 1902, c. 1323, 32 Stat. 500, known as the Supplemental Creek Agreement. In 1903 the usual tribal deeds, approved by the Secretary of the Interior and passing the full title, were issued to the allottee. In June, 1908, she died intestate, leaving her surviving a father, brothers, and sisters, but no mother, husband or issue. The survivors, like the allottee, were enrolled members of the tribe, and all were freedmen. In determining who inherited the land the courts below applied the Oklahoma law of descent existing at the time of the allottee's death, 53 Oklahoma, 272; and the question for decision here is whether under the legislation of Congress an Arkansas law, theretofore put in force in the Indian Territory, should have been applied.

When the allotment was made and the tribal deeds issued the land was in the Indian Territory, but before

the allottee died that Territory and the Territory of Oklahoma had become the State of Oklahoma.

In early times, when allotments in fee simple to individual Indians were made only occasionally, there was no congressional enactment prescribing who should inherit allotted land on the death of the allottee, and in such cases it was held that while the tribal relation continued the applicable rule of descent was to be found in the laws and usages of the tribe, and not in the laws of the State or Territory in which the land lay. *Jones* v. *Meehan*, 175 U. S. 1, 29-32. In actual practice this rule proved unsatisfactory, because the tribal laws and usages were generally crude and often difficult of ascertainment; and so in later allotment acts Congress provided that the descent should be according to the state or territorial law. A notable illustration of what came to be the policy of Congress on the subject is found in the general allotment Act of February 8, 1887, c. 119, 24 Stat. 388, the fifth section of which says that for a designated period the United States will hold the land in trust for the allottee, "or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located," and at the expiration of that period will convey the same in fee to the allottee, "or his heirs as aforesaid;" and also "that the law of descent and partition in force in the State or Territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered." True, that act has no direct application to the lands of the Five Civilized Tribes, of which the Creek tribe is one, but it does throw much light on what was intended by the subsequent legislation relating to the descent of those lands when allotted.

A territorial government never was established in the Indian Territory and it never had a territorial legislature. Apart from the tribal laws of the Indians, among which were laws relating to descent and distribution, the only

laws which became operative there were such as Congress enacted or put in force.

By acts passed in 1890, 1893, 1897 and 1898, Congress manifested its purpose to allot or divide in severalty the lands of the Five Civilized Tribes with a view to the ultimate creation of a State embracing the Indian Territory; put in force in the Territory several statutes of Arkansas, including Chapter 49 of Mansfield's Digest relating to descent and distribution; provided that those statutes should apply to all persons in the Territory, irrespective of race; and substantially abrogated the laws of the several tribes, including those relating to descent and distribution. Acts May 2, 1890, c. 182, 26 Stat. 81, § 31; March 3, 1893, c. 209, 27 Stat. 645, § 16; June 7, 1897, c. 3, 30 Stat. 83; June 28, 1898, c. 517, 30 Stat. 495, §§ 11 and 26. This was the situation when the Act of 1901, known as the Original Creek Agreement, was adopted. That act in the course of providing for the allotment in severalty of the lands of the Creeks revived their tribal law of descent and distribution by making it applicable to their allotments, §§ 7 and 28. But the revival was only temporary, for the Act of 1902, known as the Supplemental Creek Agreement, not only repealed so much of the Act of 1901 as gave effect to the tribal law but reinstated the Arkansas law with the qualification that Creek heirs, if there were such, should take to the exclusion of others.[1] *Washington* v. *Miller*, 235 U. S.

---

[1] The repealing and reinstating portion of the act was as follows:

"6. The provisions of the act of Congress approved March 1, 1901 (31 Stat. L., 861), in so far as they provide for descent and distribution according to the laws of the Creek Nation, are hereby repealed and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas now in force in Indian Territory: *Provided*, That only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation: *And provided further*, That if there be no person of Creek

422, 425–426. The allotment in question was made and the tribal deeds issued shortly after the Act of 1902 became effective. And this was followed by the Act of April 28, 1904, c. 1824, 33 Stat. 573, § 2, declaring that all statutes of Arkansas theretofore put in force in the Indian Territory should be taken "to embrace all persons and estates in said Territory, whether Indian, freedmen, or otherwise."

Referring to the purpose with which the Arkansas statutes were put in force in that Territory and to their status there, this court said in *Shulthis* v. *McDougal*, 225 U. S. 561, 571: "Congress was then contemplating the early inclusion of that Territory in a new State, and the purpose of those acts was to provide, for the time being, a body of laws adapted to the needs of the locality and its people in respect of matters of local or domestic concern. There being no local legislature, Congress alone could act. Plainly, its action was intended to be merely provisional. . . ."

By the enabling act of June 16, 1906, c. 3335, 34 Stat. 267, provision was made for admitting into the Union both the Territory of Oklahoma and the Indian Territory as the State of Oklahoma. Each Territory had a distinct body of local laws. Those in the Indian Territory, as we have seen, had been put in force there by Congress. Those in the Territory of Oklahoma had been enacted by the territorial legislature. Deeming it better that the new State should come into the Union with a body of laws applying with practical uniformity throughout the State, Congress provided in the enabling act (§ 13) that "the laws in force in the *Territory of Oklahoma,* as far as appli-

---

citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in said chapter 49."

There was a like provision, but without the provisos, in the Act of May 27, 1902, c. 888, 32 Stat. 258.

cable, shall *extend over and apply to said State* until changed by the legislature thereof," and also (§ 21) that "all laws in force in the *Territory of Oklahoma* at the time of the admission of said State into the Union shall be in force *throughout said State,* except as modified or changed by this act or by the constitution of the State." The people of the State, taking the same view, provided in their constitution (Art. 25, § 2) that "all laws in force in the *Territory of Oklahoma* at the time of the admission of the State into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be *extended to and remain in force in the State of Oklahoma* until they expire by their own limitation or are altered or repealed by law."

The State was admitted into the Union November 16, 1907; and thereupon the laws of the Territory of Oklahoma relating to descent and distribution (Rev. Stats. Okla. 1903, c. 86, art. 4) became laws of the State. Thereafter Congress, by the Act of May 27, 1908, c. 199, 35 Stat. 312, § 9, recognized and treated "the laws of descent and distribution of the State of Oklahoma" as applicable to the lands allotted to members of the Five Civilized Tribes.

As before indicated, the allottee died in June, 1908, and the courts below in determining who inherited the land from her gave effect to the state law of Oklahoma existing at the time of her death.

Two objections to that ruling are pressed on our attention: One that the allotment was made and the tribal deeds issued under the Act of 1902, which contained a provision that the descent should be according to the Arkansas law, and that thereby those who would be heirs under that law became invested with a right to inherit which could not be taken away or impaired by subsequent legislation, either federal or state; and the other that, even if Congress possessed the power to substitute

some other law of descent, that power was not exercised. Both objections are untenable.

Through congressional action the Arkansas law found in Chapter 49 of Mansfield's Digest had become the local law of descent in the Indian Territory, and when the Act of 1902 provided that the descent of Creek allotments should be in accordance with that chapter, it was but another way of saying that the descent should be in accordance with the local law. In other words, that act was made to conform to the general policy of Congress in respect of the descent of Indian allotments. Other provisions dealt with the estate which the allottee was to receive and showed that it was to be a fee simple. What was said about the rules of descent was purely legislative, not contractual; and its presence in the act gave it no effect that it would not have had as a separate enactment. Like other rules of descent it was subject to change by the law-making power as to any land not already passed to the heir by the death of the owner. Not until the ancestor dies is there any vested right in the heir. Cooley's Constitutional Limitations, 7th ed. 512.

We have seen that Congress was accustomed to subjecting allotted Indian lands to the local laws of descent, and also that its action in putting the Arkansas law in force in the Indian Territory was intended to be merely provisional. With this in mind it seems very plain that the provisions before quoted from the enabling act were intended to result, at the time of the admission of the new State, in the substitution of the Oklahoma law of descent for that of Arkansas theretofore put in force in the Indian Territory. The recognition given to the Oklahoma law by Congress in the Act of 1908 hardly can be explained on any other theory.

It well may be, as held below, that the qualification which Congress placed on the application of the local

law—then the Arkansas law—by the Act of 1902 equally qualifies the application of the Oklahoma law, *Washington v. Miller*, 235 U. S. 422, but that question is not here, for the survivors of the allottee are all Creek citizens.

*Judgment affirmed.*