TIGER et al. v. SLINKER (UNITED STATES, Intervener).

(District Court E. D. Oklahoma.    March 19, 1925.)

No. 2917.

Indians ⚖️18—Descent of lands of Creek allottee, dying since 1908, governed by laws of Oklahoma.

The lands of a Creek allottee, who died intestate since the passage of Act May 27, 1908, descend in accordance with the laws of the state of Oklahoma, and the husband of such allottee, though a noncitizen, may inherit.

In Equity.    Suit by Thomas Tiger and others against Thomas Dewey Slinker, with the United States as intervener.    Decree rendered.

Biddison & Ladner, of Tulsa, Okl., for plaintiffs.

Breckinridge & Bostick, of Tulsa, Okl., and C. A. Summers, of Muskogee, Okl., for defendant.

O. H. Graves, Sp. Asst. U. S. Atty., of Muskogee, Okl.

WILLIAMS, District Judge. It is conceded that the only question involved in this case is as to whether a noncitizen husband of a deceased Creek allottee inherits any interest in the lands of the Creek Nation allotted to such decedent, where such descent was cast after the passage of the Act of May 27, 1908 (35 Stat. 312), to wit, on March 14, 1919. In Hill et al. v. Rankin (D. C.) 289 F. 511, decided on May 24, 1923, it was said:

"As to restricted lands in the Creek Nation, where descent was cast subsequent to the taking effect of Act of May 27, 1908 (35 Stat. 312, c. 199), is such descent affected by the 'provisos to section 6 of the Act of June 30, 1902 (32 Stat. 500, c. 1323), known as the Supplemental Agreement, which provides that only citizens of the Creek Nation, male and female, and their Creek descendants, shall inherit lands of the Creek Nation, and provided, further, that, if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in said chapter 49 of Mansfield's Digest of Arkansas? Said section 6 has its prototype in the laws as ordained by Moses. See Josephus' Works, Antiquities of the Jews, book 4, c. 7, § 5, from which I quote as follows: 'At this time the chief men of the tribe of Manasseh came to Moses and informed him that there was an eminent man of their tribe dead, whose name was Zelophehad, who left no male children, but left daughters, and asked him whether these daughters might inherit his land or not. He made this answer: "That if they shall marry in their own tribe, they shall carry their estate along with them; but if they dispose of themselves in marriage to men of another tribe, they shall leave their inheritance in their father's tribe." And then it was that Moses ordained that every one's inheritance should continue in his own tribe.' See, also, Numbers, c. 36, verses 5, 6, 7.  *  *  *

"The second proviso to section 9 of said Act of May 27, 1908, provides: 'That if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March 4, 1906, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section 1 hereof, for the use and support of such issue, during their life or lives, until April 26, 1931; but if no such issue survive then such allottee, if an adult, may dispose of his homestead by will free from all restrictions; if this be not done, or in the event the issue herein before provided for die before April 26, 1931, the land shall then descend to the heirs, according to the laws of descent and distribution of the state of Oklahoma free from all restrictions.' "

Why the provision as to the descent according to the laws of the state of Oklahoma as to the restricted homestead of an intestate without issue surviving born after March 4, 1906, unless such descent applies alike to all restricted homesteads and restricted surplus, and unrestricted homesteads, and surplus? See Woodward v. De Graffenried, 238 U. S. 284, 35 S. Ct. 764, 59 L. Ed. 1310; McMurry et al. v. Producers' Oil Co. (D. C.) 284 F. 181. Does not this language of the second proviso to said section 9, relating to the same subject-matter as contained in section 6 of the Supplemental Creek Agreement (Act Cong. June 30, 1902 [32 Stat. 500]), lead to the construction that said proviso of said section 6 was not intended to be effective after the erection of the state. Tiger v. Western Investment Co., 221 U. S. 309, 31 S. Ct. 578, 55 L. Ed. 738.

Does the term, "the land shall then descend to the heirs, according to the laws of descent and distribution of the state of Oklahoma, free from all restrictions," and without any qualification as to Creek citizenship or Creek descendant, embraced in the sec-

ond proviso to said section 9 comprehend all land allotted to allottees of the Creek Nation. See Woodward v. De Graffenried, 238 U. S. 284, 35 S. Ct. 764, 59 L. Ed. 1310; McMurry v. Producers' Oil Co. (D. C.) 284 F. 183. Homesteads of all members of the Five Civilized Tribes having half or more Indian blood are restricted as to alienation, and all other homesteads, as well as all surplus allotments except those of full bloods, are freed from restrictions. Section 1 of Act May 27, 1908, 35 Stat. 312. If it be held that the term "the land," as used in said second proviso of said section 9, applied only to such restricted homesteads of such decedent (Woodward v. De Graffenried, 238 U. S. 315, 316, 35 S. Ct. 764, 59 L. Ed. 1310), did Congress intend that such restricted homesteads as therein referred to should descend without *qualification* as to Creek citizenship in accordance with the laws of descent and distribution of the state of Oklahoma, and that other restricted and all unrestricted homesteads and restricted and unrestricted surplus allotments, should descend in accordance with the laws of the state of Oklahoma, with the *qualification* that only Creek citizens and their Creek descendants should inherit, if there were such? If so, the question would arise as to whether, as to unrestricted homesteads and surplus allotments, it was within the power of Congress to control such descent after the erection of the state, especially after the final dissolution of the tribal government.

In Grayson v. Harris, 45 S. Ct. 317, 69 L. Ed. ——, decided by Supreme Court of United States on March 2, 1925, in construing said section 6, it was said:

"The purpose and policy of the provisos rest upon *tribal* rather than *family sentiment,* a sentiment which put the *interests* of the *tribe* above those of the *family,* and regarded the claims which spring from *tribal* membership rather than those arising from close degrees of kinship. * * * 'While it is true that it seems unnatural for the Indians to have preferred more distant relatives to their own children in providing for the descent and distribution of their property, yet from the terms of the act before us, and also from the provisions of the Supplemental Creek Agreement that "only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation" (32 Stat. 500), it is clear that with the Indians the interests of the tribe were paramount to those of the family and

it was with a knowledge of the mode of life of their *primitive* [italics mine] people, better and more intimate than the courts can now command, that they determined that this paramount purpose would best be served by giving to children born of mixed marriages the tribal status of their mother.' The lands of the Creek Nation were tribal lands, and the evident purpose of the Indians was to continue at least a semblance of that status so far as it could be done consistently with their distribution in severalty. With the wisdom of that purpose we have nothing to do. It is enough that Congress respected it and gave to it the sanction of law." (All italics mine.)

Under the Original Agreement, entered into by the Creeks on March 8, 1900 (31 Stat. 861), it is provided that said agreement should be ratified by the Creek National Council within 90 days from the date of the act of ratification by the Congress and approved by the President of the United States, which was on March 1, 1901, and it was so ratified by the Creek Council.

By section 7 of said Original Creek Agreement it is provided that "lands allotted to citizens hereunder shall not in any manner whatsoever, or at any time, be incumbered, taken, or sold to secure or satisfy any debt or obligation contracted or incurred prior to the date of the deed to the allottee therefor and such lands shall not be alienable by the allottee or his heirs at any time before the expiration of five years from the ratification of this agreement, except with the approval of the Secretary of the Interior."

By section 28 of the Act of June 28, 1898 (30 Stat. 504), "all tribal courts in Indian Territory" were abolished, and "no officer of said courts" could "thereafter have any authority whatever to do or perform any act theretofore authorized by any law in connection with said courts, or to receive any pay for same; and all civil and criminal causes then pending in any such court shall be transferred to the United States court in said territory by filing with the clerk of the court the original papers in the suit," but said provision was not to apply to the Chickasaw, Choctaw, or Creek Tribe of Indians until the 1st day of October, 1898.

By section 46 of the Original Creek Agreement (March 1, 1901, 31 Stat. 861) it was provided that "the tribal government of the Creek Nation shall not continue longer than March 4, 1906, subject to such further legislation as Congress may deem proper,"

which was not repealed by the Creek Supplemental Agreement (Act June 30, 1902), the Creeks by implication agreeing to the organization of a state or territorial government after the expiration of such period. By section 41 of said Agreement all of the said Act of June 28, 1898, was rendered inapplicable to and was not in any manner to affect "the lands or other property of said Tribe or be in force in the Creek Nation," except section 14 of said act, which related to the incorporation of cities and towns, and section 42 of the Original Creek Agreement further provided that "no act, ordinance, or resolution of the National Council of the Creek Nation in any manner affecting the lands of the tribe, or of individuals after allotment, or the moneys or other property."

It is also provided in said section 7 that "each citizen shall select from his allotment forty acres of land as a homestead, which shall be nontaxable and inalienable and free from any incumbrance whatever for twenty-one years," and that "the homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after the ratification of this agreement, but if he have no such issue, then he may dispose of his homestead by will, free from limitation herein imposed, and if this be not done, the land shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, free from such limitation." Section 28 of said Original Agreement (March 1, 1901) provides for the expeditious closing of the rolls of citizenship for said tribe and placing all Creek children born up to July 1, 1900. It is apparent that it was expected that all deeds for allotments should be executed prior to the expiration of said five-year period, and before March 4, 1906, the date set for expiration of the tribal governments.

In the allotting of lands in fee simple to individual Indians as made in early days, no congressional enactments prescribed the descent or distribution on the death of the allottee. In such instances, while their tribal governments continued and tribal laws were in force, it was held that the applicable rule of descent was that in accord with the laws, customs, and usages of the tribe, and not the laws of the state or territory in which the land lay. Jones v. Meehan, 175 U. S. 29, 20 S. Ct. 1, 44 L. Ed. 49. The application of such rule proving unsatisfactory, the tribal laws, usages, and customs being often difficult to ascertain, in later allotting acts Congress provided that such descent should be according to the state or territorial laws, and this was the prevailing practice when the Original Creek Agreement was adopted. Jefferson v. Fink, 247 U. S. 290, 38 S. Ct. 516, 62 L. Ed. 1117.

The descent, according to the Creek laws, as provided in section 7 of the Original Creek Agreement, changed to the Arkansas laws in section 6 of the Supplemental Agreement, with the qualification excluding therefrom all noncitizens, being prescribed with a view to the *tribal status* and not of the *family interest*, and without any expectation or intention on the part of the Creeks that the same would continue in force after the erection of the state, and that Congress also so intended is indicated by a legislative interpretation.

Congress, by Act of March 3, 1901, c. 868, 31 U. S. 1447 (Comp. St. § 3951) declared every Indian in the Indian Territory to be a citizen of the United States. Section 2 of the Enabling Act (Act June 16, 1906, 34 Stat. 267) provides:

"That all male persons over the age of twenty-one years, who are citizens of the United States, or who are members of any Indian nation or tribe in said Indian Territory and Oklahoma, and who have resided within the limits of said proposed state for at least six months next preceding the election, are hereby authorized to vote for and choose delegates to form a constitutional convention for said proposed state; and all persons qualified to vote for said delegates shall be eligible to serve as delegates. * * * "

By Act April 28, 1904, c. 1824 (33 Stat. 573), § 2, all statutes of Arkansas theretofore put in force in Indian Territory were declared "to embrace all persons and estates in said territory, whether Indian, freedmen, or otherwise." In extending or putting in force in the Indian Territory the statutes of Arkansas as embraced in certain chapters of Mansfield's Digest, "Congress was * * * contemplating the early inclusion of that territory [Indian] in a new state, and the purpose of those acts was to provide for * * * a body of laws adapted to the needs of the locality and its people in respect of matters of local or domestic concern. There being no local Legislature, Congress alone could act. Plainly, its action was intended to be merely provisional, and not to encroach upon the powers which rightfully would belong to the prospective state." See Shulthis v. McDougal, 225 U. S. 561, 32 S. Ct. 704, 56 L. Ed. 1205. By the Enabling Act of June 16, 1906 (34 Stat. 267,

c. 3335), provision being made for the erection of one state out of the territory of Oklahoma and the Indian Territory, Oklahoma territory through the intervention of a local Legislature, under the supervision of the Secretary of the Interior, and Indian Territory, through the direct intervention of Congress, having separate laws, that the new state should have a body of laws applying uniformly throughout its bounds, it was provided in section 13 that the laws in force in the territory of Oklahoma, as far as applicable, shall extend over and apply to said state until changed by its Legislature, and also by section 21 that all laws in force in the territory of Oklahoma at the time of the admission of said state to the Union shall be in force throughout said state, except as modified or changed by said act or by the Constitution of the state, and the laws of the United States, not locally inapplicable, shall have the same force and effect within said state as elsewhere in the United States. By section 2, article 25, Schedule, of the Constitution of the state, in accordance with the view of Congress, it was provided that all laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law.

The state of Oklahoma being admitted in the Union on November 16, 1907, the laws of the territory of Oklahoma relating to descent and distribution thereupon became the laws of the state, and controlled the descent and distribution of the allotment herein involved, unless Congress, exercising its reserve power as to restricted tribal allotments, provided otherwise. See Jefferson v. Fink, 247 U. S. 294, 38 S. Ct. 517, 62 L. Ed. 1117, in which it is said:

"Through congressional action the Arkansas law found in chapter 49 of Mansfield's Digest had become the local law of descent in the Indian Territory, and when the act of 1902 provided that the descent of Creek allotments should be in accordance with that chapter, it was but another way of saying that the descent should be in accordance with the local law. In other words, that act was made to conform to the general policy of Congress in respect of the descent of Indian allotments. Other provisions dealt with the estate which the allottee was to receive and showed that it was to be a fee simple. What was said about the rules of descent

was purely legislative, not contractual; and its presence in the act gave it no effect that it would not have had as a separate enactment. Like other rules of descent, it was subject to change by the law-making power as to any land not already passed to the heir by the death of the owner. Not until the ancestor dies is there any vested right in the heir."

In Blundell v. Wallace, 45 S. Ct. 247, 69 L. Ed. ——, decided by Supreme Court of United States on March 2, 1925, it was said: "The general policy of Congress, prior to the adoption of section 23 [Act April 26, 1906], plainly had been to consider the local law of descents and wills applicable to the persons and estates of Indians, except in so far as it was otherwise provided."

In U. S. v. Fox, 94 U. S. 315, 24 L. Ed. 192, it is said: "It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated. * * * The power of the state in this respect follows from her sovereignty within her limits, as to all matters over which jurisdiction has not been expressly or by *necessary implication transferred to the federal government.* [Italics mine.] The title and modes of disposition of real property within the state whether inter vivos or testamentary, are not matters placed under the control of federal authority. Such control would be foreign to the purposes for which the federal government was created, and would seriously embarrass the landed interests of the state." See, also, Green v. Biddle, 8 Wheat. (21 U. S.) 1, 5 L. Ed. 547; Mager v. Grima, 8 How. (49 U. S.) 490, 12 L. Ed. 1168; Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346; United States v. Perkins, 163 U. S. 625, 16 S. Ct. 1073, 41 L. Ed. 287; Magoun v. Illinois Tr. & Sav. Bank, 170 U. S. 288, 18 S. Ct. 594, 42 L. Ed. 1037; U. S. v. Sandoval, 231 U. S. 38, 34 S. Ct. 1, 58 L. Ed. 107.

Act April 26, 1906 (34 Stat. 137), entitled "An act to provide for final disposition of the affairs of the Five Civilized Tribes * * * and other purposes," provided (section 1) for final closing of tribal rolls, prohibiting review of prior rulings relative to enrollments, unless filed within 60 days, and any additional applications for citizenship; (section 6) for removal and appointment of principal chiefs or governors of said tribes by the President, requiring

such chiefs or governors to execute allotment patents; (section 10) for transfer of all tribal schools and property, with their administration, from tribal control to that of the Secretary of the Interior; (section 11) for collection by Secretary of Interior of all tribal revenues accruing whether before or after dissolution of tribal government, and claims arising against said tribes whether before or after dissolution of tribal government to be presented to the Secretary of the Interior for allowance and payment; (sections 12, 13, 14, 16, and 17) for immediate disposition of all tribal property and distribution of all tribal funds, except certain coal lands under lease in the Choctaw Nation which were not to be sold until the leases expired; (sections 22 and 28) for certain conveyances of inherited lands in case of organization of a state or territorial government, to be approved or confirmed on petition of the guardian by the proper county court, and the tribal existence and present tribal governments of the several nations of the Five Civilized Tribes to be continued in force for all purposes authorized by law until otherwise provided by law, but no tribal council to be in session for a period exceeding 30 days, and no act, except to adjourn, to be effective until approved by the President of the United States, and no contract made by such agencies for the payment of money to be valid unless approved by the President of the United States.

Prior to the erection of the state government the tribal government had ceased by law to function except for the purpose of advising and acting with the agents of the United States government in the winding up or final administration of matters pertaining to its property and funds. These members of the Creek Tribe being citizens of the United States when the state government was erected over them and their lands, the presumption is that the state law as to descent and distribution applies, unless the contrary is made to appear expressly or by necessary implication. The language of the second proviso in section 9 of Act May 27, 1908, providing that restricted homesteads of allottees dying leaving issue born after March 4, 1906, who did not on account of the closing of the tribal rolls receive allotments, should be held *for the use and support of such issue during their life or lives until April 26, 1931; if no such issue survive them, same may be disposed of by will free of all restrictions;* and if there be no such surviving issue, *or such issue die before April 26, 1931, then to descend according to the laws of Oklahoma, without qualification*—is a legislative interpretation that the descent with the Creek qualification prescribed in section 6 of Creek Supplemental Agreement was not continued in force as to descents cast after the erection of the state. (Italics mine.) A devise by will under such legislation being a restriction against alienation rather than a succession, section 23 of Act April 26, 1906, was made applicable to all wills executed under said provision. Taylor v. Parker, 235 U. S. 42, 35 S. Ct. 22, 59 L. Ed. 121.

Section 8 of said Act of May 27, 1908, amended said section 23 by providing that wills as there permitted may be acknowledged and approved by a judge of a county court of the state of Oklahoma. In Blundell v. Wallace, supra, it was further said: "Section 23 must be read in the light of this policy; and, so reading it, we agree with the ruling of the state Supreme Court that Congress intended thereby to enable 'the Indian to dispose of his estate on the same footing as any other citizen, with the limitation contained in the proviso thereto.' The effect of section 23 was to remove a restriction theretofore existing upon the testamentary power of the Indians, leaving the regulatory local law free to operate as in the case of other persons and property."

In the framing of the Original and Supplemental Creek Agreements (March 1, 1901, and June 30, 1902), the Creeks contemplated no governmental tribal status would exist after the erection of the new state. Tribal function retained was on account of delay by the United States government in its winding up of the property affairs of the tribe, the final dissolution being held in abeyance by the United States government for only such limited purpose.

In Re Pigeon's Estate (Pigeon v. Stevens et al.) 81 Okl. 180, 198 P. 309, the descent was cast on October 8, 1918, and the Supreme Court of the state of Oklahoma held that: "Under said provisions of the Enabling Act and the Constitution (chapter 49 of Mansfield's Digest of the Laws of Arkansas) and the provisos of section 6 of the Supplemental Creek Agreement of June 30, 1902, qualifying said chapter 49, were repealed, and the devolution of an estate of a deceased Creek allottee having died since the admission of Oklahoma into the Union is governed by the laws of descent and distribution of the state of Oklahoma, and noncitizen heirs may inherit." To the same effect, see Teague et al. v. Smith et al., 85 Okl.

12, 204 P. 439, and Harrison v. Harrison, 87 Okl. 91, 209 P. 737.

The conclusion follows that the law of descent and distribution of the state of Oklahoma applies in this case, and a decree may be prepared for submission in accord with such conclusion.