13884

MULDROW *ET AL.* v. CALDWELL *ET AL.*

(175 S. E., 501)

*Mr. W. C. Wolfe,* for appellants.

*Mr. W. B. Martin,* for respondents.

July 12, 1934.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BLEASE.

Walter Jackson, a very prosperous colored man, resident of Orangeburg County, died intestate October 22, 1931, leaving an estate, real and personal, of considerable value. He was the illegitimate son of Selina Jackson, who was also the mother of an illegitimate daughter, now bearing the name of Kate Pou. After the birth of Walter and Kate, Selina intermarried with Edward Muldrow, and to this marriage were born three children, Abner Muldrow, Rosa Pearson, and Julia White. The mother of Walter predeceased her son. Walter died childless; but his widow, Lily, whose given name is sometimes spelled in the record as "Lillie," survived him.

Charles Caldwell and Lily Jackson were appointed as administrator and administratrix, respectively, of the estate of Walter Jackson, and are now discharging the duties of their trust.

At a time, the precise date not appearing in the record, but about a year after the death of Walter Jackson, the legitimate children of his mother, Abner Muldrow, Rosa Pearson, and Julia White, instituted this action, in the Court of Common Pleas for Orangeburg County, against the personal representatives of the estate of Walter Jackson, and Lily Jackson and Kate Pou in their individual capacities, having for its object the settlement of the personal estate and the partition of the real estate of the decedent. The plaintiffs alleged that they were heirs-at-law and distributees of Walter Jackson, and were entitled, under the law, to share in the distribution of his estate. They concede that the widow, Lily, is entitled to one-half of the estate, and that the illegitimate, Kate Pou, is entitled to an interest equal to that each of them is entitled to have.

Kate Pou, the illegitimate daughter of Selina, in her answer, contended that, under the law, she was entitled to one-half of the estate of her illegitimate brother; that the legitimate children of her mother are not entitled to any interest

in the estate. She concedes the one-half interest in the estate claimed by the widow.

While the widow, Lily, is a respondent here, we assume she has no interest in the contest between the illegitimate, Kate, and the legitimate children of her husband's mother.

The case was referred to Honorable B. H. Moss, County Judge, as special referee, who, under the authority of *In re Johnson's Estate,* 154 S. C., 359, 151 S. E., 573, held favorably to the claim of Kate Pou, the illegitimate, and against the claims of the legitimate children. The exceptions to the report of the special referee, on the part of the legitimate children, were overruled by his Honor, Circuit Judge Mann, and the appeal to this Court is by the legitimate children from the decree on circuit.

Not only did the death of Walter Jackson occur prior to the enactment of the Act of the General Assembly approved by the Governor March 31, 1934 (38 St. at Large, p. 1419), to which we hereafter advert, but the report of the special referee and the decree of the Circuit Judge were made prior to the passage of that Act. Accordingly, the mentioned legislative enactment was not, and could not have been, taken into consideration by either Judge Moss or Judge Mann in the conclusions they reached.

The issue as to the respective rights of the illegitimate child and the legitimate children of Selina, the mother of Walter Jackson, can have no bearing as to the rights of the widow, Lily; since Jackson died childless, she, as the lawful wife of Jackson, is entitled under our statutes of distribution to a full one-half interest in his estate, both real and personal. The other parties to the action, therefore, have very properly conceded her right to that one-half interest.

In the *Johnson case, supra,* decided February 3, 1930, this Court considered and construed the Acts of 1906 (25 St. at Large, p. 156), 1920 (31 St. at Large, p. 1039), 1927 (35 St. at Large, p. 242), and 1928 (35

St. at Large, p. 1187), relating to the inheritance of estates by and from illegitimates, which Acts, expressive of the legislative will at the time of the adoption of the Code of 1932, were incorporated therein as Sections 8913 and 8914. It does not appear that there was any legislation touching that subject after the Act of 1928, until the Act of 1934, later discussed; so both the special referee and the Circuit Judge were correct when they determined the issue before them according to the provisions of Sections 8913 and 8914 of the Code. They were right, too, in their interpretation of the legal principles announced in the *Johnson case,* and in their conclusion at the time of their decisions that they were applicable to, and controlling of, the issue they had for determination.

A new question is raised, however, in this case by the passage of an Act by the General Assembly at its 1934 session, approved by the Governor on March 31, 1934, entitled, "An Act to Amend Section 8913 of the Code of Laws of South Carolina, 1932, by Allowing Legitimate as Well as Illegitimate Children to Inherit From or Through an Illegitimate Relative."

Pending the appeal from the Circuit decree to this Court, the legislation referred to was enacted. The appellants, desiring, of course, to have the benefit of the provisions thereof, moved in this Court that the case be remanded to the Circuit Court, with directions to that Court to consider and pass upon the effect of the new statute on the issue to be determined in this cause. Upon the hearing of that motion, it was indicated by this Court that the suggested course was not necessary; that it would save time, and possibly another appeal at the expense of the litigants, for the parties to the cause to agree, by written stipulation, that this Court should in the present appeal consider and determine the effect of the 1934 Act upon the one question to be decided. The suggestion made was adopted, and, accordingly, we now turn our attention to the 1934 enactment, with the view of as-

certaining what effect, if any, it has upon the rights of the appellants, the legitimate children of Selina, and the rights of Kate Pou, who, like the intestate Walter, was an illegitimate child of Selina.

It is not necessary to set out in full the 1934 Act. By it, the following changes were made in Section 8913 of the Code: The words "inherited from their mother," on and in the eleventh line of the first paragraph of the section, were stricken out, and no words were inserted in their place. The words, "the illegitimate child or children of the mother through whom the kinship exists," appearing at the end of the second paragraph of the section, were stricken out, and in their place these words, "the child or children of the mother through whom the kinship exists, both legitimate and illegitimate," were inserted.

The effect of the 1934 amendments to the then existing laws, those expressed in Section 8913 of the Code, was, without doubt, to give to the legitimate brothers and sisters of an illegitimate the same rights and interests as to his estate as were vested formerly in his illegitimate brothers and sisters. We think it quite likely that the purpose of the General Assembly in the enactment of the 1934 Act was to remedy what appeared to be a defect in the former laws, discovered from the opinion in the *Johnson case,* and to overcome, by legislation, the effect of the decision there. That course the General Assembly was at liberty to follow, and perhaps, as a matter of public policy, as well as one of equity, they were wise in making the change, although there may be, as has been suggested, some cogent reasons, not necessary to be here mentioned, for leaving the law as it formerly stood.

Unquestionably, too, if the provisions of the 1934 Act had been of force at the time of the death of Walter Jackson, the appellants here, his legitimate brothers and sisters, and his illegitimate sister, Kate, would have shared equally in one-half of the estate.

The third section of the 1934 Act (38 St. at Large, p. 1420) is as follows: "This Act shall take effect immediately upon its approval by the Governor *and shall be retroactive as to any estate not finally and completely settled.*" (Italics added.)

Upon the provisions of that section, the appellants place great hope and reliance, for while it appears that between the widow, Lily, and the illegitimate Kate, there has been a partition of the real estate, and proper deeds thereabout have been executed and delivered, still it is conceded that the estate has not been "finally and completely settled."

The respondents attack the retroactive feature of the legislation, alleging that such provision is unconstitutional, and with that position we are in thorough accord.

The retroactive feature is to our mind absolutely in conflict with the provisions of Section 5 of Article 1 of our Constitution, which forbids the Legislature from depriving any citizen of this State of his "property without due process of law."

Upon the death of the illegitimate intestate, Walter Jackson, subject to the rights of his creditors, the title to his real estate, under the law then existing, descended to his widow and his illegitimate sister, Kate. Upon his death, under the law then of force, the legal title to his personal estate passed to such personal representatives as would be designated under the law; but subject to the rights of his creditors, the equitable interest in that estate immediately vested in his heirs-at-law, the widow and the illegitimate sister. There can be no question under the legal principles recognized by all the authorities of these two propositions.

"By the common law, and under the statutes in most of the states, the title to real property vests in the heir or heirs immediately on the death of the intestate, subject, in case there is a surviving spouse, to dower or curtesy, and to homestead rights, and in most jurisdictions to debts of the

intestate, and to the exercise of such special powers as may be conferred upon the administrator by statute, such as the right of possession and the right to sell for payment of debts, etc." 18 C. J., 876.

"At common law, and under the statutes in most of the states, the title to personal property of a deceased person vests in the administrator, if there is one, and not in the heirs or distributees; and their rights therefore must generally be enforced through administration and distribution. The legal title to personal property is suspended between the time of the intestate's death and the granting of letters of administration; and when the letters are granted the title of the administrator relates back to the time of the intestate's death. However, persons entitled to personal property as heirs or distributees acquire a vested equitable right immediately on the death of the intestate, and on distribution their title relates back to the intestate's death, although in computing the value of the share of a particular distributee the value of the personal property at the time of distribution, rather than its value at the time of the death of the intestate, must be taken. It follows that the personal estate of an intestate goes ultimately to those who are his next of kin at the time of his death, and not to those who are his next of kin at the time of distribution, and that, where a person entitled as distributee dies after the death of the intestate and before distribution, his share does not go to the other person or persons entitled as distributees, nor does the legal title devolve directly on the heirs or distributees of the deceased distributee, but it vests in the personal representative of the deceased distributee for purposes of administration and distribution to the persons entitled thereto." 18 C. J., 878.

"As the right of one person to inherit the property of another becomes vested on the death of the latter, the statutes in force at the time of his death, as against statutes in

force at a prior or subsequent date, govern the disposition of the estate." Ibid., 808.

"Rights of heirship vest immediately on the death of the intestate; and the heirs succeed to such right and title as the intestate had and no more. Accordingly the heirs-at-law and next of kin are to be determined as of the date of the death of the intestate." Ibid., 876.

Supporting the legal principles declared in the quoted language are many decisions of our own Court, and we cite, without comment, for no comment is necessary, a few of them: *In re Malone's Estate*, 21 S. C., 435; *Corley v. Hoyt*, 116 S. C., 110, 107 S. E., 34; *Busby v. Busby*, 142 S. C., 395, 140 S. E., 801; *National Union Bank v. McNeal*, 148 S. C., 30, 145 S. E., 549, and *Whaley v. Jones*, 152 S. C., 328, 149 S. E., 841.

Since, in 1931, when Walter Jackson died, his real estate, subject to the rights of his creditors, became legally and equitably owned by his widow and his illegitimate sister, and since his personal estate, subject to the rights of his creditors and due administration thereof, became equitably the property of his widow and illegitimate sister, the Legislature of the state could not in 1934, or at any other time, divest those two persons, or either one of them, of their vested rights in the property of the intestate. An attempt to do so, either by special or general legislation, contravenes the guaranty in the Constitution to these persons that their property would not be taken from them without due process of law. The Act of 1934 did not directly, or indirectly, interfere with the vested rights of the widow. It cannot interfere with the vested rights of the illegitimate sister. If the Court could, and would, give effect to the retroactive feature of that Act, it would mean not only legislative but judicial sanction of the taking away of the property of the illegitimate sister and giving it to others. Neither the Legislature nor the Court can transfer property from one person to another, except when the right to do so is conferred

by the Constitution, and there is no constitutional authority, whereby the retroactive clause in the Act of 1934 can be made effective to transfer any of the property involved in this cause from the illegitimate sister to the legitimate brother and sisters. Our holdings in this regard are sustained by the folllowing authorities, the italics in the quotations being supplied by us:

"The state has no power to divest or to impair vested rights, whether such an attempt to do so be made by legislative enactment, by municipal ordinance, or by change in the constitution of the state. This result follows from prohibitions contained in the constitutions of practically all the states. Before the adoption of the fourteenth amendment there was no prohibition in the constitution of the United States which would prevent the states from passing laws divesting vested rights, unless these laws also impaired the obligation of contracts, or were *ex post facto laws;* but vested property rights are now protected against state action by the provision of the fourteenth amendment that no state 'shall deprive any person of life, liberty or property without due process of law.' ". 12 C. J., 956.

In support of these statements, the following decisions in our State are cited: *Columbia Water Power Co. v. Campbell,* 75 S. C., 34, 54 S. E., 833; *King v. Belcher,* 30 S. C., 381, 9 S. E., 359; *Gibbes v. Greenville, etc., R. Co.,* 13 S. C., 228; *Bowman v. Middleton,* 1 Bay (1 S. C. Law), 252; *Ham v. McClaws,* 1 Bay (1 S. C. Law), 93; *Blackman v. Gordon,* 2 Rich. Eq. (19 S. C. Eq.), 44, 44 Am. Dec., 241.

"Vested rights may be divested by forfeiture, *but the legislature.has no power to transfer property from one to another directly or indirectly."* 12 C. J., 957.

"During a person's lifetime his heirs, devisees, or legatees have no vested interest in his property which may not be destroyed by a statute or constitutional provision regulating the succession of property. Expectant heirs must look

for their vested rights to the law in force at the time of the ancestor's death. Thus it has been held within the power of the legislature to provide that advancements previously made shall be considered a part of an intestate's estate for the purposes of distribution. *Where, however, on a person's death, the rights of his heirs, devisees, or legatees have thereby become vested, these rights may not be impaired by subsequent legislation.* But an act providing that an administrator shall convey land in accordance with an agreement made by deceased before his death is not objectionable as disturbing vested rights; nor is a statute void which merely authorizes the executors to carry out a power of sale where the land had vested in the heir subject to such power." Ibid., 963.

"On the death of the decedent, however, the rights of the heirs to the real property of their ancestor attach and become vested so that subsequent legislation cannot interfere with those rights." 6. R. C. L., 314.

The General Assembly may enact retroactive legislation, unless it has the effect of impairing the obligation of a contract, or divesting vested rights of property. *McLure v. Melton,* 24 S. C., 559, 58 Am. Rep., 272; *People's Loan & Exchange Bank v. Garlington,* 54 S. C., 413, 32 S. E., 513, 71 Am. St. Rep., 800.

Speaking of, and sustaining, the constitutionality of an Act of Congress relating to rules of descent, Mr. Justice Van Devanter, for the Federal Supreme Court, clearly distinguished between the right of Congress to pass such legislation touching estates to vest in the future and those already vested. We quote from his opinion the following: "What was said about the rules of descent was purely legislative, not contractual; and its presence in the Act gave it no effect that it would not have had as a separate enactment. Like other rules of descent it was subject to change by the law-making power as to any land *not already passed to the heir by the death of the owner.* Not until the ancestor dies

is there any vested right in the heir. Cooley's Constitutional Limitations (7th Ed.), 512." (Italics added.) *Jefferson v. Fink,* 247 U. S., 288, 38 S. Ct., 516, 518, 62 L. Ed., 1117.

If the General Assembly had the constitutional right to take from Kate Pou, the illegitimate sister, her vested interest in the estate of her illegitimate brother, it had the right to take from his widow, also, her one-half interest in that estate. Would it be suggested with any reasonable basis that her property could have been transferred to some other person? The laws of the State provide for the succession of both real and personal property owned by a person who dies intestate. Any adult citizen has the right, if he desires, to die intestate. In his life, he is charged, under the law, with full knowledge of who will succeed to his property, if he dies without making a will. The fact that he died without having executed a will must be taken as a reasonable assumption that he was satisfied with the will the law of the State made for him, if he chose to die intestate. Surely, it would be unfair and unjust, not only to the heirs-at-law and distributees of the intestate, but to the dead himself, for the law-making body to make for him, after his death, a will other than the one the law had made for him in his life, of which he was charged with full notice.

In neither of the Acts of 1906, 1920, and 1927, relating to inheritance from or by illegitimates, was there any retroactive feature. In previous considerations of those statutes, the Court has not been called upon, therefore, to give any attention to the effect of legislation of that character. Many of the Acts relating to inheritance by and from illegitimates were considered in *Gibson v. Rikard,* 143 S. C., 402, 141 S. E., 726. (The report of the case is just a little confusing in the SOUTH CAROLINA REPORTER, but it is correctly reported in the *Southeastern Reporter.*) The very interesting and enlightening report of Probate Judge N. W. Workman, of Newberry County, affirmed on circuit and made the opinion

of this Court, gives valuable information on the rights of illegitimates as to inheritances.

The Act of 1928 (35 Stats., 1187), set out in the Code as Section 8914, does have a retroactive effect, and that feature of the legislation was considered in the *Johnson case, supra.* There is a distinction, however, between that Act and the other Acts on the subject.

As pointed out in *Gibson v. Rikard,* prior to the Act of 1906, only the lineal descendants of an illegitimate could inherit from him; by the 1906 Act, the mother of an illegitimate was allowed to inherit from him; by the Act·of 1920, illegitimate children of the same mother could inherit from each other, and all children of the same mother, whether legitimate or illegitimate, could inherit from each other as to property inherited from their mother. The Act of 1927 only provided for the distribution of the estate of an illegitimate, in the event there was no one to take under the law as it then stood; that is, when there was no lawful wife, no lineal descendant, no mother, and no illegitimate brother or sister (or in case the property in question was inherited from his mother, no legitimate brother or sister). The purpose of the 1927 Act was to create a *new class* of heirs or distributees to take the illegitimate intestate's property, rather than let it escheat to the State. The purpose of the 1928 Act (Section 8914 of the Code) was not to create a new class of heirs or distributees, but to make the Acts of 1906, 1920, and 1927 retroactive to prevent an escheat. When the legislature by that Act surrendered the rights of the State in the property of a deceased illegitimate, for failure of heirs or distributees to take the estate, the legislature gave away property which would have come to the State. It did not thereby transfer, or attempt to transfer, from one person to another any property of the estate. We know of no constitutional provision which would forbid the legislature, in proper cicumstances, from giving away the State's property. On the other hand,

the constitutional provisions, to which we have already pointed, do forbid that body from taking property from one person and giving it to another. The retroactive feature in the 1928 Act does not, therefore, appear to violate any constitutional provision, and, in that respect, is to be clearly distinguished from the retroactive feature in the Act of 1934. There is, therefore, nothing in the *Johnson case,* regarding the retroactive feature of the 1928 Act, which in any way conflicts with our holdings in this case.

The judgment of this Court is that the decree appealed from be, and the same is hereby, affirmed.

MESSRS. JUSTICES STABLER, CARTER and BONHAM and MR. ACTING ASSOCIATE JUSTICE W. C. COTHRAN concur.