12528

NATIONAL UNION BANK OF ROCK HILL *ET AL.* v.
McNEAL *ET AL.*

(145 S. E., 549)

 

*Messrs. Dunlap & Dunlap,* for appellants, 

*Messrs. Glenn & Macaulay,* for respondents, 

November 20, 1928.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

This case involves a construction of certain provisions of the Act of Congress, commonly called the War Risk Insurance Act, of 1917 (40 Stat., 398), and amendments thereto, and the statutes of distribution of intestate's estates contained in our law.

In 1917, James W. Carter, colored, intermarried with Daisy McNeal. At the time the said Daisy had three illegiti-

mate children, namely, Adam McNeal, Lizzie McNeal, and Peter McNeal, and it is not contended that James W. Carter was the father of any of said children. Peter was about 2 years of age, and took the name Peter Carter. Later on in the year 1917, James W. Carter was inducted into the army of the United States. There was issued to him yearly renewable term insurance in the amount of $10,000, under the Act of Congress approved October 6, 1917, and amendments thereto, in which his wife, Daisy Carter, was designated beneficiary. The insured, James W. Carter, died in January, 1918, and thereafter, and until her death on June 27, 1920, the said beneficiary, Daisy McNeal Carter, received monthly payments of $57.50 under the terms of the policy. After the death of the said beneficiary, and under Section 15 of the Act of Congress approved December 24, 1919, 41 Stat., 376 (the law in effect at the time of her death), monthly installments of $28.75 each were paid to Nathan Carter and Cornelia Currence, father and sister, respectively, of the insured; they being the only persons within the permitted class of beneficiaries entitled to this insurance under the intestacy laws of the State of South Carolina. The said Nathan Carter is still receiving monthly installments of $28.75 on the one-half of the original $10,000 policy. The said Cornelia Currence died on June 6, 1925, and thereafter the commuted value of her remaining installments, to wit, $2,695, was paid to the National Union Bank of Rock Hill as administrator of the estate of the said James W. Carter.

It appears from the statement in the "case" that:

(1) At the time of his death, January, 1918, the said James W. Carter was survived by his father, Nathan Carter, his mother, Julia Carter, his sister, Cornelia Currence, and his wife, Daisy McNeal Carter.

(2) At the time of her death, June 27, 1920, Daisy McNeal Carter was survived by her three illegitimate children,

Adam McNeal, Lizzie McNeal, and Peter Carter, alias Mc-Neal, the last of whom has since died.

(3) At the time of her death, June 6, 1925, the said Cornelia Currence was survived by her husband, Robert Currence, her father, Nathan Carter, and her mother, Julia Carter.

This action was commenced in the Probate Court for York County, in which the administrator, National Union Bank of Rock Hill, applied to that Court for an order of distribution of the funds in its hands as administrator of the estate of the said James W. Carter, deceased, and the Probate Court issued a summons and rule to show cause to all known and unknown heirs, and, in response to that summons and rule to show cause, the said Nathan Carter, Julia Carter, and Robert Currence claimed the entire amount, while the said Adam McNeal, Lizzie McNeal, and Peter Carter, the illegitimate children of the widow of the intestate, claimed a one-half thereof. Thereafter the Honorable J. L. Houston, Probate Judge of York County, passed a decree holding that the entire amount should be paid to Nathan Carter, Julia Carter, and Robert Currence, whereupon an appeal was had to the Court of Common Pleas by the said Adam McNeal, Lizzie McNeal, and Peter Carter. On December 17, 1926, the Honorable W. H. Townsend, presiding Judge, passed an order reversing the Probate Judge, and holding that one-half of the said proceeds should be paid to the appellants, Adam McNeal, Lizzie McNeal, and Peter Carter, the heirs at law of Daisy McNeal Carter, widow of the intestate, and the other half should be paid in equal shares to Nathan Carter, Julia Carter, and Robert Currence.

The case is now before this Court upon exceptions, five in number, from the decree of Judge Townsend. The exceptions raise but two questions which we deem it necessary to consider: First that the presiding Judge erred in holding that Robert Currence should share equally with Nathan Carter and Julia Carter; and, second, that the presiding

Judge erred in holding that the illegitimate children of said Daisy McNeal Carter should take one-half of the funds in the hands of the administrator of their mother.

The reservation inserted in the policy of insurance is in the following language:

"Subject in all respects to the provisions of such Act (of 1917) of any Amendments thereto and of all regulations thereunder, now in force, hereafter adopted, all of which, together with the application for this insurance and the terms and conditions published under authority of the Act, shall constitute the contract."

The War Risk Insurance Act of 1917 (referred to in the above-quoted reservation) was thereafter from time to time amended, and was by Section 14 of an Act approved March 4, 1925, amended to read, in part, as follows:

"Sec. 303. If no person within the permitted class be designated as beneficiary for yearly renewable term insurance by the insured either in his lifetime or by his last will and testament or if the designated beneficiary does not survive the insured or survives the insured and dies prior to receiving all of the two hundred and forty installments or all such as are payable and applicable, there shall be paid to the estate of the insured the present value of the monthly installments thereafter payable, said value to be computed as of date of last payment made under any existing award: *Provided,* That all awards of yearly renewable term insurance which are in course of payment on the date of the approval of this Act shall continue until the death of the person receiving such payments, or until he forfeits same under the provisions of this Act. When any person to whom such insurance is now awarded dies or forfeits his rights to such insurance then there shall be paid to the estate of the insured the present value of the remaining unpaid monthly installments of the insurance so awarded to such person: *Provided further,* That no award of yearly renewable term insurance which has been made to the estate of a last surviving beneficiary

shall be affected by this amendment. * * * This Section shall be deemed to be in effect as of October 6, 1917." 38 U. S. C. A., § 514.

In construing the above-quoted reservation contained in the policy in connection with the War Risk Insurance Act of 1917, and amendments thereto, Mr. Justice Holmes, speaking for the Court, in the case of *White v. United States,* 270 U. S., 175, 46 S. Ct., 274, 70 L. Ed., 531, said:

"These words must be taken to embrace changes in the law no less than changes in the regulations. The form was established by the Director with the approval of the Secretary of the Treasury, and on the authority of Article 1, § 1, and Article 4, § 402, of the Act, which, we have no doubt, authorized it. The language is very broad and does not need precise discussion when the nature of the plan is remembered. The insurance was a contract, to be sure, for which a premium was paid, but it was not one entered into by the United States for gain. All soldiers were given a right to it and the relation of the government to them if not paternal was at least avuncular. It was a relation of benevolence established by the government at considerable cost to itself for the soldier's good. It was a new experiment in which changes might be found necessary, or at least, as in this case, feasible more exactly to carry out his will. If the soldier was willing to put himself into the government's hands to that extent no one else could complain. The only relations of contract were between the government and him. White's mother's interest at his death was vested only so far as he and the government had made it so, and was subject to any conditions upon which they might agree. They did agree to terms that cut her rights down to one-half. She is a volunteer and she cannot claim more. See *Helmholz v. Horst* (C. C. A., 6th); 294 Fed., 417, affirming (D. C.), 283 Fed., 600; *Gilman v. United States* (C. C. A., 3d), 294 Fed., 422, affirming (D. C.), 290 Fed., 614."

The unpaid installments on the $5,000 awarded to the beneficiary, Cornelia Currence, is governed by the Act approved March 4, 1925, which appears as Section 514 of title 38 of the Code of the Laws of the United States (38 U. S. C. A., § 514) as follows:

"514. *Payment of Insurance to Estate of Deceased Beneficiary; Escheat to United States.*—If no person within the permitted class be designated as beneficiary for yearly renewable term insurance by the insured either in his lifetime or by his last will and testament or if the designated beneficiary does not survive the insured or *survives the insured and dies prior to receiving all of the two hundred and forty installments* or all such as are payable and applicable, *there shall be paid to the estate of the insured the present value of the monthly installments thereafter payable,* said value to be computed as of date of last payment made under any existing award: *Provided,* That *all awards of yearly renewable term insurance which were in course of payment on March 4, 1925, shall continue until the death of the person receiving such payments,* or until he forfeits same under the provisions of this chapter. *When any person to whom such insurance was awarded prior to such date dies* or forfeits his rights to such insurance *then there shall be paid to the estate of the insured the present value of the remaining unpaid monthly installments of the insurance so awarded to such person:* Provided further, That no award of yearly renewable term insurance made to the estate of a last surviving beneficiary prior to March 4, 1925, shall be affected by the foregoing provisions. * * * This Section shall be deemed to be in effect as of October 6, 1917." (Italics ours.)

An award of monthly installments of $28.75 had been made to the beneficiary, Cornelia Currence, from July 4, 1920, and were in course of payment on the date of the approval of the said Act March 4, 1925. As provided in said Act, they were continued thereafter until the death of the said beneficiary, June 6, 1925. Upon her death, as provided

in said Act, the present value of the remaining unpaid monthly installments of the insurance, so awarded to her, became due and payable to the estate of the insured. The disbursing officer of the Bureau of War Risk Insurance has done what the Act required him to do, to wit, paid over the present value of the remaining unpaid monthly installments of the insurance to the estate of the insured, and it is now in the hands of his administrator for distribution.

It will be observed that the said Act does not undertake to regulate the distribution of said funds after they are paid to the estate of the insured, but leaves that to be determined by the law regulating the distribution of intestate estates in the State of South Carolina.

It remains to be determined who should participate in the distribution of these funds.

The heirs at law and next of kin of an intestate are the *hæredes facti* of the statute of distributions. When it is desired to ascertain who the next of kin and heirs at law of an intestate are, it is necessary to resort to the statute of distributions. *Dukes v. Faulk,* 37 S. C., 255, 16 S. E., 122, 34 Am. St. Rep., 745; *Evans v. Godbold,* 6 Rich. Eq., 26, 28; *Seabrook v. Seabrook,* McMul. Eq., 206; *Templeton v. Walker,* 3 Rich. Eq., 550, 55 Am. Dec., 646.

Resort, therefore, must be had to the statute of distributions for the purpose of determining the heirs or distributees of the insured.

The next question that presents itself for determination is what heirs are to take; that is, whether those who can bring themselves within the class of heirs at the death of the insured, or those who can bring themselves within the class of heirs at the death of the beneficiary, Cornelia Currence. In *McFadden v. McFadden,* 107 S. C., 101, 91 S. E., 986, there was a devise to life tenants, then over to the children of testator, with the further provision that, if any of said children should die leaving no issue, such property to revert back and become the property of testator's estate to be equally

divided among his heirs, with the exception of a named daughter. Mr. Justice Gary, speaking for the Court, said:

"The vital question in the case is whether the rights of the 'heirs' are to be determined with reference to the time of the testator's death, or the death of his respective children leaving no issue.

"The well-recognized rule is that when there is a devise to 'heirs' as a class, they take at the death of the testator, unless a different time is fixed by the word 'surviving,' or some other equivalent expression. The construction of the word 'heir,' when used alone, and likewise when preceded by the word 'surviving,' is fully discussed in *Evans v. Godbold*, 6 Rich. Eq., 26. In that case the Court held that where there is a devise upon the contingency of survivorship, and a precedent life estate is interposed, upon the determination of which the survivors are to take, the period of survivorship is referred to the termination of the life estate, and not to the death of the testator. It, however, clearly appears that such would not have been the conclusion but for the word 'surviving,' as shown by the following language: * * *

"In the case now under consideration the word 'heirs' is not qualified by the word 'surviving,' or any other equivalent expression. Therefore the death of the testator, and not that of the life tenant, is the period to which we must look for the purpose of determining who are to take."

In *Avinger v. Avinger,* 116 S. C., 125, 107 S. E., 26, there was a devise to testator's wife during the term of her natural life, and after her death to be divided equally among testator's heirs. It was held by this Court, that:

"The well-recognized rule is that when there is a devise to 'heirs' as a class, they take at the death of the testator, unless a different time is fixed by the word 'surviving,' or some other equivalent expression"—citing *McFadden v. McFadden, supra.*

As the War Risk Insurance Act of 1925 does not ■ provide that the funds should be paid to the estate of the insured to be distributed among his heirs surviving at the death of the beneficiary, or any other equivalent expression, we think the death of the insured, and not the death of the beneficiary, is the period to which we must look for the purpose of determining who are to take.

It will be observed that the War Risk Insurance Act ■ in force at the time of the death of the beneficiary, Cornelia Currence, provided that, "there shall be paid to the estate of the insured the present value of the monthly installments thereafter payable." "The estate of the insured" came into being as the estate of a deceased person instantly upon the death of the insured. The rights of his heirs then vested. It does not follow that there was vested in such heirs any interest in this particular fund. What did vest was the right to the estate of the deceased, whatever it might be, and whenever it might accrue. The commuted unpaid installments have been paid to the estate of the insured. It must be distributed to his heirs as of the date of his death. *Pivonka v. Pivonka,* 202 Iowa, 855, 211 N. W., 246, 55 A. L. R., 570; *Singer v. Tikalsky,* 192 Wis., 524, 213 N. W., 479.

Having held that we must resort to the statute of distributions for the purpose of determining who the heirs of the insured were at the time of his death, and the proportion such heirs take, we now proceed to examine that statute for the purpose of determining who are to take the funds now in the hands of the administrator.

Subdivision 2 of Section 3555, of the Code of 1912, is, in part, as follows:

"If the intestate shall leave no child or other lineal descendant, but shall leave a widow, and a father or mother, and brothers and sisters, or brother or sister, of the whole blood, the estate, real and personal, of such intestate shall be distributed in the following manner, that is to say: the widow shall be entitled to one moiety thereof, and the other moiety

shall be equally divided amongst the father, or, if he be dead, the mother and the brethren of the whole blood; so that such father or mother, as the case may be, and each brother, and sister, shall receive an equal share thereof."

It will be observed that, at the time of the death of the insured, his mother was not an heir, provided his father was at that time living. It was not until the Act approved March 11, 1920, Statute 31, p. 873, that Section 3555 was amended so as to make the mother an heir along with the father. At the time of his death, therefore, the insured was survived by his widow, Daisy McNeal Carter, his father, Nathan Carter, and his sister, Cornelia Currence, as his only heirs at law. His widow was then entitled to one-half of any estate belonging, or that thereafter should belong to the estate of her husband, the insured, and the father and sister of the insured were entitled to the other one-half.

The illegitimate children of the widow of the insured are not entitled to take as heirs of the insured, but as heirs of their mother by virtue of the Act of 1906 (25 Stat., 156) which provides:

"That any illegitimate child or children, whose mother shall die intestate, possessed of any real or personal property, shall be, so far as said property is concerned, an heir or heirs at law as to such property, notwithstanding any law or usage to the contrary." Section 1.

It follows, therefore, that the said three illegitimate children of insured's widow were, at her death, entitled to the share to which she was then entitled. It appears that subsequent to the death of the beneficiary, Cornelia Currence, June 6, 1925, one of said illegitimate children, to wit, Peter Carter, died. Paragraph 2 of the Act of 1920 (Acts 1920, p. 1039) is as follows:

"The * * * illegitimate children of the same mother shall have the same right to inherit from each other that they would have had they been legitimate."

The Circuit Court properly held that one-half of the funds now in the hands of the administrator should be paid to the two surviving illegitimate children of the insured's widow. He committed error, however, in holding that Julia Carter, the mother, was an heir of the insured. As above pointed out, under the law as it then stood, she was not an heir. The right to the other one-half of the estate of the insured passed upon his death to his father, Nathan Carter, and his sister, Cornelia Currence. This would give a one-fourth of the estate of the insured to his father, Nathan Carter, and a one-fourth to his sister, Cornelia Currence. Upon her death, one-half of her one-fourth of said estate passed to her husband, Robert Currence, and the other one-half of her one-fourth of said estate passed to her mother and father, Nathan Carter and Julia Carter, as her heirs at law (the mother being an heir by virtue of the Act of 1920, above referred to).

It is the judgment of this Court that the decree of the Circuit Court be modified in accordance with the views herein expressed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES STABLER and CARTER concur.

MR. JUSTICE COTHRAN (dissenting) : The effect of the conclusion announced in the opinion of Mr. Justice Blease is that the commuted insurance paid by the government to the administrator of the dead soldier, is to be distributed as follows:

| | | |
|---|---|---|
| To the illegitimate children of Daisy Carter, wife of the soldier, one-half ........................ | | $1,847.50 |
| To Nathan Carter, father of the soldier, one-half of the remaining half ........................ | $923.75 | |
| And one-half of one-half—one-fourth —of the interest of Cornelia Currence, $923.75 ................ | 230.93 | 1,154.68 |

| | |
|---|---:|
| To Julia Carter, mother of the soldier, one-half of one-half—one-fourth—of the interest of Cornelia Currence, $923.75 .......... | 230.94 |
| To Robert Currence, husband of Cornelia Currence, one-half of her interest $923.75 ............... | 461.88 |
| | $3,695.00 |

Of the commuted insurance there will thus be paid to the illegitimate children of Daisy Carter, *none of them in the slightest degree related to or dependent upon the soldier,* $1,847.50, and to the father and mother, *presumably dependent,* $1,154.68 plus $230.94, $1,385.62—a result that I cannot believe is within the spirit of the Act of Congress.

The purpose of the act is disclosed in the opening paragraph of the act:

"In order to give to every commissioned officer and enlisted man * * * when employed in active service * * * *protection for themselves and their dependents."* (38 U. S. C. A., § 511.)

It is also provided that *the insurance,* which necessarily covers the installments as well as the commuted insurance, "shall be payable only to a spouse, child, grandchild, parent, brother or sister," which was later amended by including other relatives. (38 U. S. C. A., § 511.)

It is also provided that the insured shall at all times have the right to change the beneficiary, but only "within the classes herein provided"; that is, to some one of the relatives specifically enumerated above. (38 U. S. C. A., § 512.)

The provision in the act of 1925 (38 U. S. C. A., § 514), directing that in the event that the beneficiary should die pending the payments of the 240 installments, the commuted insurance shall be paid to the estate of the insured, clearly contemplates that the insurance shall be paid to those heirs at law *as could have been made beneficiaries,* according with

the expressed intention that the insurance shall be for the protection of the insured and his dependents, among whom it must be assumed the permitted beneficiaries are included.

There are quite a number of State decisions which sustain the position taken in the opinion of Mr. Justice Blease, in addition to those cited by him. *Palmer v. Mitchell,* 117 Ohio St., 87, 158 N. E., 187, 55 A. L. R., 556; *Williams v. Eason,* 148 Miss., 446, 114 So., 338, 55 A. L. R., 574; *State v. Cross,* 147 Wash., 441, 266 P., 711; *Woodworth v. Tepper,* 152 Md., 332, 136 A., 536, 55 A. L. R., 578; *Battaglia v. Battaglia* (Tex. Civ. App.), 290 S. W., 296; *Smallwood's Est.,* 156 Tenn., 222, 300 S. W., 572; *Fink's Est.,* 191 Wis., 349, 210 N. W., 834.

The question does not appear to have reached any of the federal Courts since the passage of the act of 1925. The cases of *Cassarello v. U. S.* (D. C.), 271 F., 486; *Helmholz v. Horst* (C. C. A.), 294 F., 417; *Salzer v. U. S.* (D. C.), 300 F., 764, affirmed (C. C. A.), 300-F., 767, *certiorari* 300 F., 764, affirmed (C. C. A.), 300F., 767, *certiorari* denied 273 U. S., 702, 47 S. Ct., 90, 71 L. Ed., 884.

While strongly interpretative of the intent of the act, they involved a construction of the act prior to the amendment of 1925, and are not strictly apposite to the present situation.

The case, however, of *Sutton v. Barr,* 219 Ky., 543, 293 S. W., 1075, is squarely in point; its reasoning is quite appealing to my conception of the law.

In that case the beneficiary of the insurance policy was the mother of the soldier, who had, after the death of the father of the soldier, married a second husband. The insurance was awarded to her upon the death of the soldier in 1918, and the installments were paid to her until her death in 1924. She left surviving her the second husband and a granddaughter, and by her will the granddaughter was the legatee of what might be coming to the beneficiary from the government. The soldier left as his heirs at law his mother, the beneficiary, and several brothers and sisters.

An administrator of the estate of the dead soldier was appointed and to him the government paid the commuted insurance amounting to $3,695, the exact amount paid in the case at bar. In a contest as to the distribution of the fund, the granddaughter claimed it as the legatee of the beneficiary; *the second husband claimed one-half of it as the heir at law of his wife, the beneficiary;* the brothers and sisters claimed it as the sole heirs at law of the soldier, at the time of the death of their mother, the beneficiary. The Court said:

"It is earnestly insisted for appellants that as by the act of Congress this money is paid to the administrator of the deceased, the administrator holds it for distribution under the statute of Kentucky, and that the fact that the mother was the beneficiary in the policy in no way lessens her rights as the heir of her son. In other words, it is insisted that the mother takes this money as the heir of her son, and that she is no less entitled to it than she would be if she had not been named as the beneficiary in the policy.

"On the other hand, it is insisted that under the acts of Congress, taken as a whole, the heirs of the son in being at the time of the death of the beneficiary take the property and not those who were his heirs at his death. The Circuit Court adopted this view. This question is not new, but we have not been able to find any express authority upon it. It is suggested in *Salzer v. United States* (D. C.), 300 F., 764, but not decided.

"Some force must be given to the provision of the original act that the insurance shall only be paid to certain classes of persons. It was the plain purpose of Congress in making this provision to confine the benefits of the insurance to the relatives of the deceased. If any other construction is adopted in cases like this, the bulk of the fund might go to strangers to the deceased or persons having no natural claim on him. To illustrate, the purpose of the act was to protect the beneficiary, *but it was not the purpose of the act to pro-*

*tect, as in this case, the second husband of the beneficiary.*
If Mrs. Sutton took this fund she could devise it as she
pleased, and so all the interest of those naturally connected
with the deceased soldier could be defeated. We must give
some force to the evident intention of Congress that if the
designated beneficiary did not survive the insured the insur-
ance should be payable to such persons within the permitted
class of beneficiaries as would be entitled to his personal
property in case of intestacy. Plainly the same rule should
apply where the beneficiary survives the insured but dies be-
fore the money is payable.

*"The judgment of the Circuit Court is in accord with the
spirit and purpose of the acts of Congress. Any other con-
struction of the act would lead to a distribution of the fund
in a way plainly not contemplated by Congress."* (Italics
added.)

It seems to me, therefore, that to allow the insurance to be
paid to the illegitimate children of Daisy Carter violates the
purpose of the act in limiting the beneficiaries to the named
relatives of the soldier and the provision that the changed
beneficiary shall belong to one of the classes specified. The
payment of the commuted insurance to the administrator
of the soldier is but a convenient channel of distribution, and
to allow the stranger heirs of the beneficiary to participate
is violative of the foregoing provisions. The payment to
them cannot be reconciled with the positive statement of
the Act, unaffected by the Act of 1925, that the insurance
shall be paid only to certain relatives.

"So far as disclosed by this record, it was neither the in-
tent nor the purpose of either of the contracting parties
[the U. S. and the soldier] to enter into a contract of in-
surance on the life of Marshall for the benefit of his half-
brother and half-sisters." *Helmholz v. Horst* (C. C. A.),
294 F., 417.

In *Salzer v. U. S.* (D. C.), 300 F., 764, affirmed on ap-
peal, 300 F., 767, by the Circuit Court of Appeals, and

*certiorari* denied by Supreme Court, 273 U. S., 702, 47 S. Ct., 90, 71 L. Ed., 884, the soldier insured, Sebastian Salzer (evidently a misprint for Sebastian *Ryan*), died October 16, 1918; his wife, the beneficiary, died the following day, each intestate. The insured left neither father, mother, brother, sister, grandparent, nor descendent surviving him; his wife left surviving her, a father, mother, and sister. Mrs. Ryan's father, Salzer, died in 1919, leaving surviving him, his widow, Mrs. Delia Salzer, mother of Mrs. Ryan; Mrs. Salzer was appointed administratrix of Salzer, her husband's estate and as such sued for the installments payable during the period from October 17, 1918, the date of the death of Mrs. Ryan, to August, 1919, the date of the death of her husband, Salzer, upon the theory that, upon the death of Mrs. Ryan, the installments were inherited by Mrs. Ryan's father, the husband of Delia Salzer. The Court denied her claim. The Circuit Judge who heard the case said:

"The real question is: Does the person who at the death of the insured would take his personal property in case of intestacy acquire a vested interest in all subsequent instalments, even though a designated beneficiary acquires no such vested interest? * * * If in this case the wife, as the person entitled to her husband's estate on intestacy, took at his death a vested interest in the instalments payable after her own death, then *the instalments might go to persons not within the designated classes.* * * * The person entitled to the insurance, whether on the death or in the absence of a named beneficiary, *must trace his claim directly from the insured.*"

Upon appeal, the Circuit Court of Appeals said:

"We find it unnecessary to add much to the clear and careful opinion of Judge Mack. It is, and indeed must be, conceded that under a certificate of war risk insurance the beneficiary does not acquire a vested interest on the death of the insured. [citing cases.] Upon the facts here existing, the disposition of the insurance must be in accordance with

the intestacy laws of New York. The question, then, is whether the insurance shall go to those who would benefit under the New York statute as the relatives of the deceased soldier or as the relatives of Rose M. Ryan, the wife of the deceased soldier, who died the day after Ryan died. * * * We are satisfied that the legislation in question evidences the intent of Congress that the *intestacy laws shall operate in respect of the relatives of the deceased soldier.*"

As I have indicated above, this case involved a construction of the law prior to the amendment of 1925; but I find nothing in that amendment calculated to affect the reasoning of the *Salzer case*.

"Those claiming under beneficiary of war risk [insurance] policy, acquire no interest in instalments falling due after beneficiary's death." Storum's Estate, 128 Misc. Rep., 168, 218 N. Y. S., 394.

"Beneficiary of war risk insurance policy has no vested interest in insurance, and unpaid instalments on beneficiary's death pass to next of kin under state statute. Storum's Estate, 128 Misc. Rep., 168, 218 N. Y. S., 394.

"It is evident therefore that the beneficiary named by the insured, or designated by law, took no vested interest in this insurance other than to the accrued payments during the time the beneficiary was entitled to receive the same and that further instalments would not pass by the law of descent and distribution to the heirs of the beneficiary, nor could the beneficiary devise the same by will." *Helmholz v. Horst* (C. C. A.), 294 F., 417.

Aside from the expressed, manifest purpose of the act to provide for the protection of the soldier and his dependents, it strikes me as a most illogical contention that the beneficiary who is given a definite interest in the insurance, the right to collect the installments so long as she might live (limited of course to 240), and has lost all of her interest by death pending the completion of the installments, shall

be held to have acquired a vested right in something which only came into existence by reason of her death.

The illegitimates can be entitled to participate in the fund only as heirs of their mother, who must herself have possessed the right; this cannot be when the right came into existence at her death. And so with Robert Currence, the husband of Cornelia.

Where property is devised for life to a certain person, who was an heir of the testator, with remainder over to the heirs of the testator, without qualifying words indicating a limitation to *surviving* heirs, the death of the life tenant would not destroy the vested remainder of the life tenant in the fee, as a tenant in common with the other heirs; this vested remainder of the life tenant would be transmissible to his heirs. *McFadden v. McFadden,* 107 S. C., 101, 91 S. E., 986; *Avinger v. Avinger,* 116 S. C., 125, 107 S. E., 26.

This is based upon the essential fact that the life tenant all the while from and after the death of the testator owned a vested remainder in the fee which was not terminated by his death but descended to his heirs. As is said in the *McFadden case,* quoting from *Evans v. Godbold,* 6 Rich. Eq., 26:

"Without the use of it [referring to the word 'surviving'], the heirs of testator at his death would have taken a vested interest, transmissible to their representatives, and widowers and widows of the children, not heirs of the testator, would have taken shares."

This presents an entirely different situation from that presented in the case at bar. The latter does not at all present a case of particular estate and remainder. During the lifetime of the beneficiary, the estate of the insured possessed nothing more than an expectant interest, which could only come into existence upon the death of the beneficiary during the 240-instalment period. It was not a vested interest even in the estate of the insured, and certainly the interest of the beneficiary in that expectant interest could not be en-

dowed with a higher quality than the interest of the estate. If only an expectant interest, an interest which did not exist at all during the life of the beneficiary and which came into existence only at her death, it was not such a contingent interest even that was transmissible.